CROXTON et al. v. STATE et al.

*97 P. 2d 11.*

No. 28863.   Nov. 21, 1939.

Rehearing Denied Dec. 19, 1939.

J. D. Holland and Vic Croxton, of Norman, and R. G. Stevens and Roy M. Glasco, of Purcell, for plaintiffs in error.

Earl Foster, Conservation Attorney, and James C. Hamill, Ass't Conservation Attorney, for defendants in error.

Anglin & Stevenson and Vernon Roberts, all of Holdenville, of counsel.

DAVISON J. This is an appeal from an order of the Corporation Commission entered in connection with its administration of the provisions of article 1, ch. 59, of the Session Laws of 1935, which is commonly known as "the well-spacing act," and deals with the drilling of wells into a single pool or common source of supply.

The area defined by said order as overlying a common source of supply designated therein as "the Noble Pool" consists of twelve entire sections of land in Cleveland and McClain counties.

The hearing which resulted in the order was had upon the application of one W. A. Delaney, Jr., who with his associates owns leases in the area and upon one of them on May 22, 1938, completed the first and only producing well that has been drilled into that pool.

According to the plan incorporated in the order appealed from, the wells in the Noble Pool are to be located "as nearly as practicable * * *" in the center of triangular units containing 20 acres each as outlined upon a map attached to the order. From an examination of said map, it appears that each 40-acre tract in the twelve sections is divided into two of these right-angle triangles with the dividing line between both of said triangles forming the hypotenuse of each and extending diagonally from northeast to southwest or vice versa. The order also provides that "in event a producing well is completed in an area owned by two or more persons, firms, or corporations, the rights of those interested therein shall be determined, adjusted, and controlled by section 3, art. 1, chap. 59, Session Laws of Oklahoma, 1935."

At the hearing before the Corporation Commission, the signed protests of many persons to Delaney's application were introduced. Several of these persons have prosecuted the present appeal, and will hereinafter be referred to merely as "the protestants." The appellees are the Corporation Commission and the State of Oklahoma. The former will hereinafter be referred to merely as "the commission," and since its argument on appeal is presented as that of both appellees, we will make no further reference to the state as a separate party herein.

The argument of the protestants attacking the present order is submitted under two principal propositions set forth in their brief. The first of these is as follows:

"The Corporation Commission was without jurisdiction or authority to make any order providing for a greater spacing than 10 acres for the reason that not 80% of the lessees of record as of the date of bringing in of the first well and owning at least 80% of all acreage embraced within the probable area of the common source of supply agreed to a larger unit."

The above proposition is based upon the contention that the evidence introduced before the Corporation Commis-

sion does not show the area in question to be a proper one for 20-acre spacing under the prerequisite set forth in section 3, art. 1, ch. 59, Session Laws 1935, as follows:

"The drilling unit shall not exceed ten (10) acres in size, unless eighty per cent. (80%) or more of the lessees of record as of the date of bringing in the first well and owning at least eighty per cent. (80%) of all the acreage embraced within the probable producing area of the common source of supply agree to a larger unit, *but* in no event shall such a drilling unit exceed forty (40) acres * * *"

To show a compliance with the above provisions of the statutes, the applicant (Delaney) took the witness stand and read the names of 33 individuals, firms, and corporations from a tabulation compiled by his associate, Mr. Sledge, which he said reflected "the ownership of the acreage in that territory as of the date of the completion of the well." Of this number, the signed letters, telegrams, and written statements giving the consent of 28 to the establishment of 20-acre drilling units were introduced. The oral consent of three more of the 33 lessees named by Delaney was given at the hearing. According to the statements themselves and the testimony on behalf of the applicant, the consenting lessees comprise more than 80% of the lessees of land in the area and their leases cover more than 80% of the acreage therein. To refute this evidence, the protestants introduced the written protests of many "landowners and owners of mineral interests" within the area, and testimony tending to show that some of them were lessees of record as of the date of the completion of the well. At the close of the evidence, the commission, in connection with the rendition of its order, made the following specific finding (among others), to wit:

"That 80 per cent. or more of the lessees of record as of the date of the bringing in of the first well in said common source of supply and owning at least 80 per cent. of all the acreage embraced within the probable producing area as above described have agreed to the establishment of 20-acre drilling units."

Without discussing, in detail, the evidence introduced on behalf of the protestants, it is sufficient to say that, after a thorough examination of same, we find it inadequate to overcome the presumption which has so often been recognized in favor of the findings of the Corporation Commission on appeal to this court. See St. Louis & S. F. R. Co. v. Williams, 25 Okla. 662, 107 P. 428; Kansas City, M. & O. Ry. Co. v. State, 25 Okla. 715, 107 P. 912; Ft. Smith & W. Ry. Co. v. State, 25 Okla. 866, 108 P. 407; Muskogee Gas & Electric Co. v. State, 81 Okla. 176, 186 P. 730; Oklahoma Gas & Electric Co. v. Wilson & Co., 146 Okla. 272, 288 P. 316, and many others.

The protestants further contend, however, that the commission erred in not considering the owners of royalty as well as the owners of unleased mineral rights in determining whether or not the "eighty per cent. (80%)" required by section 3, art. 1, chap. 59, Session Laws of 1935, had consented to the spacing. They say that if these classes of owners are considered, the number consenting to 20-acre spacing, according to the evidence, clearly falls short of 80 per cent. of the total. Counsel for the commission call our attention to the fact that the only class of owners whose consent the statute specifically requires is "lessees of record," and in view of this fact they contend that all others are excluded. In our opinion, this is obviously the correct interpretation to be given said enactment. An examination of the statute as a whole reveals nothing therein that casts sufficient doubt upon the intention of the Legislature in using these words to warrant their judicial interpretation. This being true, they must be accorded their plain and natural meaning. See Falter v. Walker, 47 Okla. 527, 149 P. 1111; Shaw v. Grumbine, 137 Okla. 95, 278 P. 311; Leahy v. Ind. Ter. I. O. Co., 39 Okla. 312, 135 P. 416. Under the doctrine of express mention and implied exclusion (expressio unius est exclusio alterius), those whose consent section 3, supra, requires for the establishment of drilling units of less than forty (40) acres is necessarily limited to 80 per cent. of "the lessees of record" to the exclusion of all

others, including the owners of royalty and unleased mineral rights. Counsel for the protestants have cited us to authorities for the proposition that lessees of undivided interests in a tract of land are tenants in common with the owners of the undivided interests in said tract, and the further proposition that one of such tenants does not have the authority to lease the interests of the others. That such may be correct rules of law does not change the meaning of the statute in question.

The second proposition set forth in the protestants' brief is divided into three parts as follows:

"(a) The findings, order and action of the Corporation Commission are contrary to law.

"(b) Said findings, order and action are in violation of the Fifth Amendment to the Constitution of the United States and contrary to section 23 of article 2 of the Constitution of the State of Oklahoma; contrary to the Fourteenth Amendment to the Constitution of the United States and section 7 of article 2 of the Constitution of the State of Oklahoma; and section 2 of article 2 of the State Constitution; impairs the obligation of contracts in violation of section 10 of article 1 of the United States Constitution, and section 15 of article 2 of the State Constitution.

"(c) Said findings, order and action are not sustained by sufficient evidence, and contrary to the evidence, is discriminatory; is arbitrary, unreasonable and unjust, and confiscatory of the property of these appellants and all others similarly situated."

As we view the argument in support of the above proposition, it may be summarized in the assertion that the triangular spacing ordered in the present case is not only contrary to the plan of well-spacing contemplated in the Well-Spacing Act, but that it deprives the protestants of rights guaranteed to all citizens under both the State and Federal Constitutions.

In arguing that the type of drilling or spacing units ordered in the present case does not conform to the design of the statute, the protestants assert that a well drilled in the center of any individual unit thus established will either drain oil from under adjoining units and thus drain the oil from under land in which the owners of the unit have no title or it will fail to drain the oil from the corners of said triangular unit. This contention is founded upon the proposition that a well drilled into a pool or common source of oil supply will ordinarily drain the oil from a more or less equal radius from around the well. Upon this premise the protestants demonstrate their contention by superimposing two circles upon a triangular form drawn in identically the same shape as each of the drilling units established by the order in question. It is readily apparent from this drawing that the larger circle encompassing the corners of the triangle extends beyond the sides thereof and that the smaller circle drawn within the triangle does not include its corners.

It seems to be the contention of the protestants that by the passage of the Well-Spacing Act, the Legislature contemplated that the outline of the drilling units established by the authority thereof should follow geographical property lines so that they would assume the shape of square or rectangular forms. It is recognized that nowhere in the act was any attempt made to specify the shape of the units, but the argument is that, since a square unit would more nearly conform to the circular shape of the ordinary drainage area, as well as to geographical property boundaries, that this must have been the type of unit intended. In answer to this argument, the commission calls our attention to that part of section 3, art. 1, chap. 59, S. L. 1935, which specifically provides that in establishing a well-spacing or drilling unit for a common source of supply "* * * the shape thereof shall be determined by the commission. * * *" The only provision to which the protestants refer in support of their argument is that part of section 3, supra, which limits the size of the units established by the commission to an area of forty (40) acres. They say that since it is only 933.37 feet from the center of a square 40-acre tract to each of its corners and is 1,043.53 feet from the center to two of the corners of the triangular spacing unit com-

plained of, the latter have a larger drainage radius than those contemplated in the act. It will thus be seen that the protestants' argument is based purely upon speculation or assumption as to what was in the minds of the legislators when they enacted the provisions referred to. If the Legislature had intended to restrict the shape of the units to square ones, it would have been a simple matter to have inserted such a restriction in the act. In the absence of any such express provision, it is not within the province of this court to formulate one; especially, in view of the specific vesting of the commission with the authority to determine what shape said units shall be.

The contention that the order is a void and unconstitutional usurpation of the police power because the evidence shows that the drainage area of the wells under the drilling or spacing units established will perhaps not coincide with the boundaries of said units likewise cannot be upheld. Among the findings of fact announced by the commission in entering the order in question were the following, to wit:

"5. That taking into consideration the depth of the Wilcox sand in said common source of supply, and the thickness, porosity, and permeability of the sand, together with the great expense of drilling wells therein, and the expense of operating same by reason of the apparent water condition and the amount of oil that it is estimated will be produced from each per acre foot, all as shown by the testimony herein and scientific information obtained from other fields producing from sands of similar nature, spacing and or drilling units of 20 acres in size should be established in said pool. 6. That one well to each 20 acres will adequately drain the said common source of supply and will conserve the reservoir energy, and will cause said field to be operated in a uniform manner, thereby protecting the correlative rights of all the owners and operators in said common source of supply; that development of said pool with 20-acre spacing will cause said field to be more fully and completely developed, thereby resulting in greater ultimate benefit not only to the operators and owners but also to the State of Oklahoma."

It will be observed from the above quotation that the order made in connection with said findings thus purported to be entered for purposes which the police power may be exercised to accomplish, without violating any of the portions of the State or Federal Constitutions that the protestants have referred to. See Patterson v. Stanolind Oil & Gas Co., 182 Okla. 155, 77 P. 2d 83. The protestants claim that this power has been exercised in an unconstitutional manner in the present case and they rely on the evidence to show this. Their complaint is directed principally against the shape of the units established. This is a characteristic of the units that is not mentioned in the findings.

As hereinbefore noted, the protestants attempt to show that the spacing of the Noble Area by dividing it into triangular units will not protect the correlative rights of the owners of land in the individual drilling or spacing units. By the demonstration we have already described, their counsel attempt to show that any given well in the area will either fail to drain all of the area underlying the triangular unit on which it is located or it will drain the oil from portions of the area underlying adjoining units; which of the two results that occur being dependent, of course, upon the length of the well's drainage radius. We find sufficient basis in the testimony for the premise that ordinarily a well will drain the oil from a more or less concentric circle around it, but there is also undisputed testimony to the effect that the symmetry of the drainage area's outline is largely dependent upon conditions in the common source of supply such as the permeability and porosity of the oil-producing sand, as well as the number and location of other wells penetrating the same. All of the geological and scientific data concerning the common source of supply in question is contained in the testimony of the applicant, Delaney. The matters therein dealt with are substantially the ones mentioned in the Well-Spacing Act. Upon the basis of the undisputed facts he related, Delaney testified that the establishment of 20-acre spacing units in the area is necessary in

254

order to bring about the efficient use of the reservoir energy and the greatest ultimate recovery of oil; the uniform and equidistant spacing of wells; and the uniform and even withdrawal of oil in the area. He further said that these things could only be accomplished by making said units triangular in shape and that such a plan of well-spacing would result in the adequate drainage of the common source of supply and the protection of the correlative rights of the lease and royalty owners therein. These statements were corroborated by other witnesses who testified in support of Delaney's application. The only evidence that was offered to dispute this testimony was based upon the hypothesis that the drainage area of a well consists of a perfect circle around it. It was never established that such would be true of wells drilled in the Noble Pool according to the plan outlined in the order complained of. However, there was testimony tending to prove that the boundaries of the drainage areas of said wells would perhaps not exactly coincide with the surface boundaries of the units upon which they were drilled and it was readily conceded that the drainage of oil is not restrained by surface property lines. Therefore, assuming that not one of the wells located as directed in the commission's order will drain all of the oil from under the particular unit upon which it is located, and further assuming that a portion of the production of each well will be derived from under adjoining units, would it necessarily follow that together said wells will not adequately drain the Noble Pool and enable a just distribution of the oil therein between the owners of the various units? Undoubtedly, this question must be answered in the negative. Such facts, if true, would not constitute an effective contradiction of the affirmative evidence to the contrary. The weakness of the protestants' prediction as to the effect of the drainage of one of the prospective wells upon the mineral rights of owners in adjoining units lies not only in the fact that it is based upon a hypothetical condition not proved to exist, but in the further fact that it deals with such portions of the area, separately, and as individual and distinct units, rather than collectively, as component parts of the whole or common source of supply. Mr. Delaney gave undisputed testimony to the effect that the drainage of an isolated well will differ materially in size and shape from that of a well located near other producing wells. Also, the fact that oil from under more than one unit is commingled in the production of a well on one of the units may conclusively show that the owners of said unit are not recovering precisely the oil which lies under their unit and no more, yet such a fact would not establish that said owners were recovering more than their proportionate share of the oil in the common source of supply. For these reasons we say that the evidence upon which the protestants rely is insufficient to show that the order complained of is contrary to the evidence. As they have failed to discharge their burden of showing such error, the presumption of the reasonableness and correctness of the order still remains.

The protestants further contend that the order is unconstitutional because it impairs the contract right, acquired through their leases and mineral deeds, to drill wells upon their leased land. This contention refers to the contemplated operation upon said asserted right of section 3, art. 1, chap. 59, S. L. 1935, which is invoked by the present order to govern the rights of the owners of mineral rights in the Noble Pool. For the purpose of dealing with the argument concerning this contention, it is necessary to notice the following provisions of said statute, to wit:

"If two or more separately owned tracts are embraced within an established spacing or drilling unit, any oil lessee or other person having the right to drill one of said separately owned tracts may do so; provided, the allowable production from said separately owned tract shall be such proportion of its daily capacity as herein determined as the acreage of said separately owned tract bears to the entire acreage of the spacing or drilling unit upon which it is drilled. If, under the conditions first recited in this subsection, an oil lessee or

other person owning a majority or more of the acreage included in the spacing unit, and/or having the right to drill the same for oil, shall elect to drill a well on his acreage, he shall give the other oil lessees or persons owning acreage in the unit, and/or having the right to drill the same for oil, 15 days written notice of his intention to drill, and such notice shall show the estimated reasonable cost of drilling, equipping and completing the well. And any of said oil lessees or persons within said 15-day period, by contributing to the lessee or person intending to drill said well such proportion of the estimated reasonable cost of drilling, equipping and completing the same, as the acreage of the contributor bears to the total acreage owned, or controlled for oil producing purposes by oil lessees or persons, who are participating in the cost of the well, shall thereupon be entitled to a corresponding share of seven-eighths (⅞) of all production from said well * * *. Any lessee or person so contributing to the cost of said well on said majority acreage shall thereupon be bound and obligated under the provisions of this subsection not to drill a well on the separate acreage held by him in said unit. Where another or other lessees or persons owning separate tracts in the unit contribute to the cost of the well drilled on the majority acreage, as above provided, the allowable production from said well shall be such proportion of its daily capacity as herein determined as the majority acreage plus the separately owned tract or tracts of the contributor or contributors bears to the entire acreage of the unit."

It will be seen by an examination of the above-quoted provisions that they do not prohibit any owner of mineral rights in land lying within a drilling unit from drilling on said land. The protestants contend, however, that their prevention from drilling is the practical result of the operation of the statute upon conditions as they exist in the Noble Area. They say that, since the evidence shows that it costs from $110,000 to $130,000 to drill a well in the area and that the per-acre recovery of oil therein is not more than 750 to 800 barrels of oil, it would be unprofitable for them as lessees of the minority of the acreage within certain units to drill a well on their own leases and then not be allowed to produce a larger

percentage of the capacity of the well than their acreage bears to the number of acres in the entire unit. They further assert that thus being prohibited, by economic considerations, from drilling on their own leases, they must persuade the lessees of the majority of the land in the units in which they are located to drill the wells for said units. They further assert that if they are successful in procuring the majority owner of the land in each unit to drill the well thereon, then they are forced into a partnership with him in the venture; that if they are unsuccessful, they must submit to the drainage of oil from under their leases by wells on adjoining units (some one or more of which may have been developed and may be owned by a lessee who owns a majority of the mineral rights in the same units in which theirs are located and has refused to drill thereon). They say that the net result of the composite operation of such circumstances would be to deprive them of property without due process of law, either by having the oil drained from under their leases or having said leases canceled for failure to drill thereupon.

An analysis of the above-described argument reveals that the protestants' real complaint is not that they may not drill on their own leases, but rather that after they have completed producing oil wells thereon, they are restricted in the amount of oil they may produce therefrom. Limiting production is but one way of effecting a just distribution of the oil in a common supply and at the same time conserving said supply through the prevention of waste. To do this is within the police power of the state as shown by the authorities cited in Patterson v. Stanolind Oil & Gas Co., supra. As we have already revealed, the protestants go to great lengths in their argument to illustrate the detriment that they will suffer from the operation of the restrictions on production from their leases put in force by the order in question, but they fail to show that by reason thereof said order is invalid. With reference to a similar argument in the Patterson Case, we cited the following quotation from the

256

Case of Lombardo v. City of Dallas, 124 Tex. 1, 73 S. W. 2d 475, 478, to wit:

"All property is held subject to the valid exercise of the police power; nor are regulations unconstitutional merely because they operate as a restraint upon private rights of person or property or will result in loss to individuals. The infliction of such loss is not a deprivation of property without due process of law; the exercise of the police power upon subjects lying within its scope in a proper and lawful manner, is due process of law."

In State v. Redmon, 134 Wis. 89, 114 N. W. 137, 14 L.R.A. (N. S.) 229, it was held:

"Police regulations which are reasonable are not inhibited by the Constitution, though invading its letter, since the exercise of police power is so essential to the public welfare that it is presumed that such exercise within reasonable limits was not intended to be prohibited, but, on the contrary, guaranteed by the general declared purpose of civil government and the manifest purpose of the Constitution."

The protestants also assert that the order appealed from is unreasonable, arbitrary, and confiscatory. It is difficult, if not impossible, to lay down an all-embracing test of reasonableness by which the great variety of situations impelling legislative regulation can be measured. It has been said that such regulation must be reasonable in the sense that it must be based on reason as distinct from being wholly arbitrary or capricious. 11 Am. Jur. 1079; People v. Griswold, 213 N. Y. 92, 106 N. E. 929, L.R.A. 1915D, 538. Some authorities say that a reasonable regulation under the police power is one that is reasonably necessary and fairly appropriate to accomplish a purpose for which said power may lawfully be exercised. See Bonnett v. Vallier, 136 Wis. 193, 116 N. W. 885, 17 L. R.A. (N. S.) 486; Chicago v. Gunning System, 214 Ill. 628, 73 N. E. 1035, 70 L. R.A. 230; State v. Dalton, 22 R. I. 77, 46 Atl. 234, 48 L.R.A. 775. Such characteristics have also been considered in testing the reasonableness of drilling regulations. See Marrs v. City of Oxford, 24

F. 2d 541, on appeal, Id., 32 F. 2d 134, 67 A.L.R. 1336; Brown v. Humble Oil & Refining Co. (Tex.) 83 S. W. 2d 935, 99 A.L.R. 1107. In the present case the only evidence that was introduced to show that the invocation of the restrictions upon production set forth in section 3 of the Well-Spacing Act is unnecessary in the Noble Area was the testimony of Mr. Croxton to the effect that there are no small tracts of less than ten acres in said area. We submit that such evidence is wholly insufficient to show that such restrictions are not reasonably necessary and appropriate to secure for the owners of mineral rights in the Noble Pool a just distribution of the oil therein or to prevent the waste of said common source of supply. The burden was upon them to do this in order to overcome the presumption of reasonableness which attends such orders on appeal. To the same general effect, see Champlin Refining Co. v. Corp. Comm., 286 U. S. 210, 76 L. Ed. 1062.

Nor can it be successfully contended that the order is discriminatory or that it denies to the protestants the equal protection of the laws merely because it puts into effect the provisions of section 3, supra, whereby the lessees of the majority of the land in the several units are allowed to produce more oil from their portion of said units than are the minority lessees or owners. That under said provisions both classes of owners are allowed to produce the proportion of the allowable production of the whole unit that their acreage bears to the entire acreage in the unit is not shown to bring about an unjust distribution of the oil in the Noble Pool among the two classes. We do not see how the protection of each owner's right to produce oil to the extent of the quantum of his interest can come within the definition of the term "discrimination." The difference in the volume of production the various owners are allowed to produce is thus based upon a natural and reasonable, rather than an arbitrary, distinction. Such a differentiation is not discrimination. For definitions of "discrimination" see Words & Phrases (3rd Series) vol. 2, p. 1074; Franchise Motor Freight Ass'n

v. Seavey (Cal.) 235 P. 1000; People v. Schomig (Cal. App.) 239 P. 413, 414. The mere fact that the provisions in question allow the owner of the majority of the land in each unit the right to initiate the drilling of a well to be joined in by the owners of the minority of the acreage in said unit at their pleasure is not denial to the latter of the equal protection of the laws. Before they could successfully maintain such a contention, they would have to show that they and the majority owner are "similarly situated." See Hover v. Oklahoma City, 133 Okla. 71, 271 P. 162. It is obvious, of course, that the situations of the two classes of owners are dissimilar in the quantum of their ownership and all differences of interest which such a dissimilarity would naturally create.

Another of their contract rights which the protestants contend is impaired by the order before us is that of having offset wells drilled upon their land. They do not allege that this right is granted them by the express terms of any contract, so we will assume that they merely refer to the implied covenant that accompanies the ordinary form of oil and gas lease that the lessee will protect the leased land against drainage from wells on adjoining leases. Such drainage is one of the evils which regulations such as the Well-Spacing Act were designed to minimize. In the absence of sufficient proof that the protestants' land or leases will be drained by wells drilled and producing as directed in the present order and that a just distribution of the oil in the Noble Pool will not be thereby secured for the owners of mineral rights therein as stated in the finding accompanying said order, it is unnecessary for us to settle the protestants' rights under such a state of facts.

The protestants next contend that the portions of section 3, art. 1, chap. 59, S. L. 1935, purporting to vest the Corporation Commission with power to settle certain disagreements that may arise between the lessees of any drilling unit embracing two or more separately owned tracts concerning the drilling of a single well on said tract are invalid. As we have

mentioned, the provisions contemplate the drilling of the well by the owner of the drilling rights on the majority of the acreage therein and the contribution of the minority owners to the costs of said well. The words of the statute are as follows:

"* * * If any person intending to contribute, as above set forth, shall not be satisfied with the estimate of the cost of drilling, or with the financial ability of the majority owner to drill the well, and if, thereupon, either or both of these questions cannot be settled by agreement among all persons intending to contribute to the cost of the well and the majority owner, the dissatisfied person, upon written application filed with the commission and under the procedural requirements of section 131, Session Laws of 1933, including notice, shall have a hearing on his application before the Corporation Commission to determine either one or both of said questions as submitted in his said application. If the evidence before the commission warrants a reduction in the estimated cost of said well as herein provided, the commission shall so order, and obedience to an order so made shall comply with the provisons of this subsection; provided, further, that if on the final completion of the well, it shall be found that the original estimate of the person drilling the same, or the reduction thereof by the commission, as herein provided, does not represent the actual reasonable cost of drilling, equipping and completing said well, nothing herein contained shall prevent the parties sustaining such cost, by agreement, or appropriate legal proceedings from adjusting . said actual cost among themselves, in the proportion hereinbefore set forth. If the evidence at said hearing warrants, the commission, by its order, shall require the person who gave notice of his intention to drill the majority acreage to deposit with the commission, or in a bank designated by it, or in one agreed upon by the parties, a sufficient sum in cash to cover the estimated cost of drilling, equipping and completing said well, as made by said person, or as readjusted by said commission, said sum to be returned to the depositor upon evidence furnished the commission that the cost of said well has been fully paid; or in lieu thereof, the commission may require the person intending to drill said well to file with said

commission his bond in the penal sum equaling said estimated cost, payable to the parties who shall have agreed to contribute to the cost of said well, as herein provided, duly signed by the principal and a responsible surety company qualified to do business in the State of Oklahoma."

It is the contention of the protestants that the above-quoted provisions effect an unconstitutional delegation of judicial power over private controversies of which the courts in this state have exclusive jurisdiction. In support of this contention we are cited to Smith et al. v. Corporation Commission, 101 Okla. 254, 225 P. 708, in which we held that the jurisdiction of the commission is limited to those controversies wherein the rights of a public utility and the patrons thereof are involved. Since that decision, however, this court has been called upon to interpret the effect of the original waste prevention statute (House Bill No. 168, S. L. 1915, sections 11565-11574, O. S. 1931) upon the commission's jurisdiction. In Russell v. Walker et al., 160 Okla. 145, 15 P. 2d 114, we held that by the provisions of said statute, the Corporation Commission has jurisdiction to determine questions of fact involving the enforcement of the provisions of that legislative enactment and to impose penalties as therein provided. In demonstrating that the jurisdiction of the commission could be extended over such matters, in the Russell Case we said that the view that there is no constitutional provision authorizing said commission to take or exercise control over property other than that of public service corporations does not take into consideration the full import and effect of section 35, art. 9, of the Oklahoma Constitution, which authorizes the amendment of sections 18 to 34 thereof, by which the jurisdiction of the commission was originally limited as described in Smith et al. v. Corporation Commission, supra. In Patterson v. Stanolind Oil & Gas Co., supra, we followed the reasoning in Russell v. Walker, supra, and held that the commission's administrative powers of a judicial nature could be extended as they have in the Well-Spacing Act. Since the jurisdiction of the Corporation Commission is not limited to the matters which the protestants mention, we see no reason why the delegation of administrative powers involving discretion of a quasi-judicial character contained in said act should not also be upheld. It will be noticed by an examination of the provisions complained of that the Corporation Commission is not thereby imbued with exclusive jurisdiction over the ultimate rights of the parties to the controversies mentioned in the quoted provisions. By the express language therein contained, the act does not purport to grant to that body the power which the courts have heretofore exercised. Those provisions only furnish a means by which the general purposes of the act may more readily be accomplished, in lieu of or until the disagreements therein mentioned may be settled amicably or by litigation. As we view the powers granted the commission by section 3, supra, they are merely incidental to and come within the scope of the broad general power whose delegation to said body was upheld in Russell v. Walker, supra.

The protestants next assert that the order appealed from is defective because it is conflicting and inconsistent. They claim that the plat of the Noble Area attached to said order as "Exhibit A" shows that the wells in said area are to be drilled at a different location upon the drilling units than the one prescribed in the order and contemplated in the Well-Spacing Act. The pertinent part of the order reads as follows:

"That well-spacing and/or drilling units be and the same are hereby, established in said common source of supply as follows: Each quarter section embraced in said area, together with any extensions thereof, shall be divided into 20-acre units, triangular in shape, as shown by Exhibit 'A' attached hereto, which plat shows the surface area of said common source of supply together with each drilling and/or spacing unit hereby established, the location of the well already drilled, *together with the location of each and every well that may be drilled therein; that each well shall be drilled in the approximate center of each such triangular unit as nearly as*

*practicable taking into consideration the topography of the land and any surface improvements or other obstructions* * * *."* (Italics ours.)

Section 3, art. 1, chap. 59, S. L. 1935, provides that the wells shall be located as near the center of the drilling units "as may be."

Exhibit "A," referred to in the quoted portion of the order before us, shows the boundary lines of each of the twelve sections in the area, together with the outline of each 40-acre tract in each section. A diagonal line is drawn between the northeast and southwest corners of each 40-acre tract dividing each into two 20-acre triangles. An examination of the plat further reveals a small circle drawn upon each of the triangles which apparently represents the location of the well to be drilled thereon. As far as the plat affirmatively shows, these small circles are in the approximate center of the triangles. The protestants assert, however, that instead of being in the center of the triangles, the well locations are placed by the map in the center of the ten-acre tracts in the northwest and southwest corners of each 40-acre tract. By mathematical calculation they demonstrate that the center of the ten-acre tracts mentioned is more than 100 feet from the true center of the triangular units in which they are situated. Since the plat does not show the boundary lines of the square ten-acre tract comprising the various sections of the area, it in itself does not affirmatively show the truth of the protestants' charges with reference to the well locations. This being true and the well locations shown thereon appearing to be placed in the approximate center of the units, the possibility that they are in the center of the ten-acre tracts which counsel speaks of rather than in the center of said drilling units is more a matter of speculation and conjecture than a matter of fact appearing from the face of the instrument. A comparison of the order proper and the plat, therefore, reveals no patent ambiguity or repugnancy between the two. In our opinion, resort should not be allowed to inference or conjecture for the fabrication of an ambiguity or repugnancy in an order or judgment that does not affirmatively appear on the face thereof. See Minneapolis Gaslight Co. v. Minneapolis, 123 Minn. 231, 143 N. W. 728. Because of this principle and a well-founded reluctance to extend the interpretation of judgments and orders beyond what is expressed therein or follows by necessary implication therefrom (34 C. J. 503, sec. 795; 42 C. J. 555, sec. 263), we cannot sustain the protestants' argument, but must uphold the order in question as a regular and unambiguous one.

As the protestants have failed to present sufficient cause for a reversal of the order of the Corporation Commission herein appealed from, the same is hereby affirmed.

BAYLESS, C. J., WELCH, V. C. J., and CORN, GIBSON, and HURST, JJ., concur. RILEY, OSBORN, and DANNER, JJ., dissent.