LARKINS-WARR TRUST et al. v.
WATCHORN PETROLEUM
CO. et al.

No. 31700. March 12, 1946.

Rehearing Denied Sept. 10, 1946.

Second Petition for Rehearing Denied
Nov. 26, 1946.

174 P. 2d 589.

John H. Poe, of Tulsa, and Cantrell, Carey & McCloud, of Oklahoma City, for plaintiffs in error.

Embry, Johnson, Crowe, Tolbert & Shelton and F. C. Love, all of Oklahoma City, for defendant in error. Watchorn Petroleum Company.

Ames, Monnet, Hayes & Brown, of Oklahoma City, for defendant in error H. M. S. Corporation.

Catlett & Kerr, Dean Terrill, and W. R. Wallace, all of Oklahoma City, for defendant in error Kerlyn Oil Company.

BAYLESS, J. Larkins-Warr Trust, a trust estate, et al. appeal from a judgment of the district court of Oklahoma county in favor of Watchorn Petroleum Company, a corporation, et al. Since the relations of the parties plaintiff and defendant were mutual in their respective groups and their positions as parties are the same here as in the trial court, we shall refer to them as plaintiffs and defendants.

Plaintiffs instituted the action for the purpose of recovering damages alleged to have been suffered as the result of injuries inflicted upon their property by defendants. Plaintiffs owned and operated on oil well, and defendants also owned and operated an oil well about 200 feet away. Both wells produced from the same sand at about the same depth. Trouble developed in defendants' well, and in their operations to remedy the situation, large quantities of water from upper water strata went into the well and down into the oil bearing sand, threatening injury to the sand. Later defendants were forced to plug their well and introduced into the oil bearing sand at the bottom of their well several foreign substances that eventually sealed the bottom of

their well. It is plaintiffs' theory that the water admitted into the oil bearing sand by defendants drowned plaintiffs' well, and it was many months before plaintiffs were able to restore any production in their well after expending considerable money. Defendants do not deny that this water did this injury to plaintiffs. It is also plaintiffs' theory that an additional injury and damage was done them by the blocking effect upon the producing oil sand caused by the sealing-off effect of the material defendants used to plug their well. Defendants do not so readily admit the full effect so attributed to this procedure by plaintiffs.

Plaintiffs' petition contained two causes of action. It is first alleged that the trouble that developed in defendants' well and all of the operations that followed to remedy it arose from the negligence of defendants. This negligence was pleaded in detail, and was supported and controverted by voluminous evidence. The trial court submitted this issue to the jury, and the jury resolved the issue in favor of defendants. It was also alleged that the injury and damage suffered by plaintiffs resulted, irrespective of negligence, from trespass, and violated plaintiffs' rights under sec. 23, art. 2, Constitution of Oklahoma. The trial court refused to submit this issue to the jury. It was defendants' theory and defense throughout that the trouble in their well initially was not the result of their negligence, that their efforts to remedy the situation were not done negligently, and the rules of law sought to be applied by the plaintiffs were not applicable.

The evidence introduced by the parties was voluminous. The position assumed by the plaintiffs meant that their evidence, as well as any evidence helpful to them introduced by defendants, was intended to support both its causes of action. That is to say, the jury could find negligence or could fail to find negligence and yet attach liability from the same evidence. The trial court solved this alternative when it refused

to submit the second issue, and the jury terminated the issue of negligence by finding there was none. The issue of negligence is effectually removed from consideration because the plaintiffs do not contend that the jury's verdict is not supported by evidence. Therefore, we have before us only the incidental errors of law involved in the submission of the issue of negligence and in the refusal to submit the issue of trespass.

It is first urged that the trial court committed error in refusing to submit the second cause of action to the jury and, instead, directing a verdict against plaintiffs thereon. This contention is presented in four divisions, viz., defendant committed an underground trespass, defendants took and damaged plaintiffs' property for private gain in violation of the aforesaid provision of the Constitution, defendants violated 52 O. S. 1941 § 296 and 76 O. S. 1941 § 1, and defendants have caused a "private nuisance" or a "nuisance per accidens."

Plaintiffs point out that under Keller v. Tracy, 183 Okla. 463, 82 P. 2d 1046, and other decisions, in considering the motion for directed verdict, the trial court must concede to be true all evidence favoring and supporting plaintiffs' position, and must indulge all legitimate inferences and deductions arising therefrom to that and also, and in addition must disregard all evidence tending to favor or support the defense. With this as a premise, reference is then made to the record for proof of what defendants did, and the contention of absolute liability is asserted to be so conclusively established under the above rule governing motions for directed verdicts as to render the error of the trial court's ruling apparent.

A summary of the evidence shows the following facts: With the two wells located and producing as aforesaid, defendants' well began suddenly and without prior warning to produce 100% water and mud on June 21, 1941. After certain preliminary checks, defendants decided that there had occurred a col-

14

lapse of their 7″ casing at about 4,660 feet below the surface. They pulled the rods, and the pump, after some difficulty, and undertook to pull the tubing. After extreme difficulty, including the felling of their derrick, defendants succeeded in pulling the tubing apart at the point where it was frozen by the collapsed casing. They then introduced devices into the casing and reamed or rolled it into its original round shape down to the top of the remaining tubing. They then spent days endeavoring to fish the tubing out, but were unable to do so. During all of this time it was known that water from the known strata near the point of collapse of the casing was running into the casing and downward into the sand, threatening injury thereto. The quantity of water thus going inside the casing and passing downward through the annular space between the inside diameter of the casing and the outside diameter of the tubing, or perhaps in addition through the tubing, was never known, nor the extent to which it may have varied. It is calculated that such water at the depth of the strata was under about 1,900 or 2,000 pounds of pressure. In any event, defendants concede that they cut a breach in the casing at about 4,660 and their tool passed out of the casing and drilled downward to below 4,685, and probably there their tool cut another breach in the casing and reentered. This was about the 13th or 14th of August. Almost immediately thereafter plaintiffs' well began to produce 100% water and mud. None of the operations of defendants designed to fish out the tubing from their well succeeded, and they resorted to introducing various types of material into their well to staunch or stop the flow of water. Not being successful, defendants eventually introduced large quantities of plugging materials into their well with the design of plugging and abandoning it, and finally succeeded in so plugging their well that no water could come in from above. In the first operation designed to staunch the flow evidences of the material so introduced made their appearance in the fluid pumped from plaintiffs' well. This, plaintiffs assert, and defendants do not seriously deny, was proof of the interconnection underground of these two wells, and tends to support plaintiffs' theory that, as a result of the several years' producing of these wells, the oil sand had eroded into channels or canals, and shows that anything defendants did would naturally have had an effect on plaintiffs' well. Plaintiffs thus account for the flooding of their well in this manner, and also attribute their permanent reduction in production to the blocking of the channels or canals by the plugging material used by defendants.

Plaintiffs disregard the element of negligence in judging these facts and insist that these facts were sufficient to justify submitting the second cause of action to the jury and to support a verdict in their favor under any or all of the four rules of law cited above. They cite 1 Am. Jur. 504, and many cases to be found in the footnotes thereof dealing with adjoining landowners, as well as in 52 Am. Jur. 835 et seq. dealing with trespass, and the texts and decisions dealing with underground waters, to establish the law of trespass and the law relating to the use of property by one owner to the detriment of another owner's property. They urge that irrespective of negligence, defendants owed plaintiffs the duty to so operate their well as to not injure plaintiffs' well, a duty common to adjoining landowners, and particularly owed a duty by common law as well as statute law, to retrieve the situation in which they found themselves, when their well began to show signs of underground trouble, to protect surrounding wells. Defendants do not deny this and cite as relief from the rules of law relied on by plaintiffs the ameliorating factor of accidental intrusions, and the miscarriage of ultra-hazardous undertaking, Restatement of the Law Torts (A.L.I.). As we understand defendants, they do not minimize the obligation upon them, but they do insist that in consideration of this and of the participation by plain-

tiffs with them in what is recognized as a hazardous business, liability for the harm that touches all of them from the operations of one (not involving negligence) does not attach as insisted by plaintiffs. The defendants, to not only negative negligence but to establish the fact of their proper and prudent discharge of the onerous duty they suddenly found resting upon them, introduced much evidence as to the manner of their operations and the reasonable discretion leading thereto.

Consideration of the fact that from the inception of this trouble (even though commingled with desire and effort to save their well and thus to avoid losing their own property) defendants labored under a recognized duty to prevent their well drowning the surrounding wells and ruining the producing sand, leads us to the conclusion that the rules of law relied on by plaintiffs do not govern here. 52 O. S. 1941 § 296 reads:

"No inflammable product from any oil or gas well shall be permitted to run into any tank, pool or stream used for watering stock; and all waste of oil and refuse from tanks or wells shall be drained into proper receptacles at a safe distance from the tanks, wells or buildings, and be immediately burned or transported from the premises, and in no case shall it be permitted to flow over the land. Salt water shall not be allowed to flow over the surface of the land."

A casual reading of this section discloses that it was not designed to cover underground conditions such as is before us. The reference to any tank, pool or stream used for watering stock, the requirement that waste of oil and refuse shall be transported from the premises and burned, and the positive prohibition against permitting such matter or salt water to flow over the surface of land all disclose an intent to deal with the surface of land and not subterranean interests. 76 O. S. 1941 § 1 is the statutory statement of the basic principle of tort law. Our later discussion of other points will cover this and

fully dispose thereof. The section of the Constitution has been before this court in a number of cases involving a variety of issues, none of which is similar to the one now being considered. Indeed, none of the parties have been able to cite a case reasonably analogous. The case of Green v. General Petroleum Corp., 205 Cal. 328, 270 P. 952, cited by plaintiffs, involves factors that wholly differentiate it from the facts, the relations of the parties hereto, and the duties resting upon the respective operators. Section 23, art. 2, Constitution of Oklahoma, is a corrollary to section 24, art. 2, the latter governing the taking and damaging of private property for public use. It would not be practical to attempt to point out any differences between the construction and application of the underlying principle that sustains both in the protection of the right to own property free of molestation. The many cases that have arisen under each illustrate the extent to which claims of immutable right are weighed in the light of the police powers and the rights and duties of others. Croxton v. State, 186 Okla. 249, 97 P. 2d 11. These two sections go a long way toward property owners' reasonable protection, but they do not have the effect of segregating and isolating each owner's property into an utterly inviolable sphere around which others must live in a state of absolute peril.

As we have said before, plaintiffs assert and defendants admit that from the time water and mud showed up in defendants' well the latter were under the common law and statutory duty to stop the water from getting into the casing in this well and passing downward into the sand. The question now is: Did defendants do anything that can be treated as an intentional endangering or sacrificing of plaintiffs' well in an endeavor to save their own, or that defendants indifferently did so? We think not, and for that reason are of the opinion the trial court correctly refused to submit the issue to the jury.

Defendants entered upon the performance of the duty thrust upon them,

and it cannot be said that anything they did was deliberately done with the intent to damage plaintiffs' property or that it was done indifferently. The most that can be said for plaintiffs' position on this issue is that they contend that defendants were under an absolute duty to stop the flow of water into the oil-bearing sand and likewise under an absolute duty to insure plaintiffs against injury or damage from any of the operations designed to stop the flow of the water.

We think the second aspect of this contention is not correct. Defendants only owed plaintiffs the duty to use every means a prudent operator would adopt to stop the flow of the water and to use every reasonable means to avoid injuring plaintiffs' property in doing this. This is illustrated by the decision in Oklahoma City v. Hoke, 75 Okla. 211, 182 P. 692. There a dam, erected by city for the use by and protection of its waterworks and other utilities, washed away, and a nuisance existed with respect to city's property which it was authorized to abate. It was charged that in abating this nuisance for its benefit it took or damaged Hoke's property without his consent and without compensating him. The jury found the city guilty of the negligence charged. The test by which city's rights were judged is stated as follows:

"A careful consideration of the evidence shows that the city in abating the nuisance was only exercising its legal rights and doing what it was authorized to do, both at common law and under the statutes of Oklahoma. Rev. L. 1910, sec. 4261. And that in so acting it was protecting its property, the municipal waterworks plant. . . .

"An examination of the instructions given show that the court instructed the jury, if they found there was a nuisance existing, the city would be liable only in the event that its officers failed to exercise ordinary and reasonable care in abating the same, or, in other words, in building the dam. This was the correct rule to guide the jury in this case, and the instructions of the court correctly submitted this rule, and it was not error to refuse the instruction offered by defendant.

"There is another well-settled rule that if a city, under its power to abate a nuisance, is proceeding against that which is in fact a nuisance, because of its situation, nature, or use, it is then under the obligation to exercise the power of abatement in a reasonable manner so as to do the least injury to private rights, and if, where the fact of the nuisance is clear, it exercises the power of abatement in an unreasonable, careless, and negligent manner so as to produce unnecessary damage to private rights, it will be liable for damages caused by such negligence."

We think there is enough analogy between the situations and motives of city in that instance and defendants here to make the rule announced therein properly applicable here.

We think none of the rules of law discussed herein presume liability for the unsuccessful performance of a duty thrust upon defendants, as in this instance, where there is no negligence involved.

Plaintiffs have assigned as error relating to the issue submitted to the jury a number of rulings of the trial court touching the instructions given or refused and the admission and rejection of evidence.

Among these is the complaint that the trial court refused to give an instruction on the rule of res ipsa loquitur. Plaintiffs were not entitled to have an instruction on this rule since they were asking for instructions on the theory of actual negligence. Parties are only entitled to such an instruction when there has been a failure of proof of the specific acts of negligence charged, but such evidence as has been introduced meets the other conditions justifying the application of the rule. As stated in Bewley v. Western Creameries, 177 Okla. 132, 57 P. 2d 859:

"The plaintiff relied on specific negligence on the part of defendants, and so relying and acquiescing in the giving of instructions bearing upon specific

negligence, he will not be heard to say that the 'thing speaks for itself' so as to raise a presumption of negligence."

There are a number of complaints about instructions on the rules of law governing liability, circumstantial evidence, the likelihood of tortious acts of others commingling with defendants' acts, unavoidable accidents, and mining partners. We have considered the instructions given and judged them in the light of the evidence and the issues raised thereby, and have compared and contrasted them with the instructions requested. After so doing, we have come to the conclusion that the instructions given substantially cover the issues, that they fairly and adequately explain to the jury the applicable rules of law, and that the rejection of instructions requested by the plaintiffs was not harmful.

Complaint is also made concerning the admission and rejection of evidence. For instance, plaintiffs took the deposition of Kerlyn's managing agent shortly before the trial, and tendered parts thereof as admissions against interest, relying on Aldred v. Ray, 54 Okla. 154, 153 P. 664, and other cases. It is not apparent to us that this witness denied or evaded or contradicted any statement made in this proffered testimony in his testimony while on the stand in the trial of this case. In fact, we do not recall an instance in his cross-examination by plaintiffs where they undertook to impeach his testimony by challenging him with prior testimony. If the rejection of this proffered evidence was a violation of any rule of evidence, we think it was harmless in its effect on plaintiffs.

In considering these assigned errors involving instructions and evidence, we cannot avoid the conclusion that this case was tried to the fullest extent by both sides within the boundaries properly set by the trial judge, and that the jury's verdict, on the one issue permissible to submit to them, for either party would have been sustained by ample,

substantial evidence. In such an instance we feel that the errors complained of are harmless.

The judgment appealed from is affirmed.

GIBSON, C. J., HURST, V. C. J., and RILEY, OSBORN, CORN, and DAVISON, JJ., concur.

RILEY, J. (dissenting on rehearing). I agree with the law stated in paragraph 1 of the syllabus of the majority opinion if nonnegligence of the operating defendant, as a fact, could be accepted for the rule of law.

In the Hoke Case (Oklahoma City v. Hoke, 75 Okla. 211, 182 P. 692), relied upon, it was ruled:

"The defendant cannot certainly escape liability for its acts, when in the abatement of a nuisance it creates a condition which in effect is a nuisance as to the plaintiff," but for its "act which results in damages to third persons . . . it will be liable".

The majority say: "Defendants do not deny that this water did this injury to plaintiffs". Plaintiffs sought recovery for damages upon two causes of action, one was negligence, the other trespass. The jury resolved the former in favor of defendants. The trial court declined to submit to the jury plaintiffs' second cause of action, but thereon directed a verdict for defendants.

The general rule of law is that, irrespective of negligence, a person is bound to so use his own property as to save from injury and damage that of another. 1 Am. Jur. 504, 52 Am. Jur. 835. Sic utere tuo ut alienum non laedas.

The issue whether, in a hazardous undertaking, liability which ensues from a harm that befalls all similarly situated is a delicate one. According to local law, Const., sec. 23, art. 2, 76 O.S. 1941 §1, codifying the common law as to torts, I think the issue was one for a jury to determine by verdict whether plaintiffs were entitled to recover from defend-

18

ants, damages for injury to them, proximately caused by a physical invasion or trespass in or upon plaintiffs' land, whether resulting from negligence constituted of act of omission, or commission, or otherwise. I cannot conclude that the plaintiffs' second cause of action presented a case of damnum absque injuria.

A private corporation or person has no more right than a municipal corporation, in abating a nuisance, to take or damage the property of another without making payment by just compensation. Oklahoma City v. Hoke, supra; Oklahoma City v. Vetter, 72 Okla. 196, 179 P. 473. "An act which results in a trespass upon and the actual injury or destruction of the property of a citizen is . . . the taking of such property, at least pro tanto." Town of Southeast v. City of New York, 89 N.Y.S. 630. This, the constitutional provision in Oklahoma settles by requiring redress for private property either taken or damaged. ". . . no one is permitted to sacrifice his neighbor's property in order to protect his own". Gulf, C. & S.F. Ry. Co. v. Richardson, 42 Okla. 457, 141 P. 1107. Except in such manner as may be prescribed by law, "No private property shall be taken or damaged for private use . . without compensation . . ." Section 23, art. 2, Const. of Okla. Thus, by fundamental law, an owner is afforded protection against an invasion of damage to his freehold.