**PANHANDLE EASTERN PIPE LINE COMPANY, a corporation, Appellant,**

v.

**M. E. ISAACSON, sole surviving Trustee of the Mary Phyllis Neal Trust; and Howard C. Johnson, Appellees.**

**The TEXAS COMPANY, a corporation, Appellant,**

v.

**M. E. ISAACSON, sole surviving Trustee of the Mary Phyllis Neal Trust; and Howard C. Johnson, Appellees.**

**Claire K. HALL, Executrix of the Estate of Elmer Hall, Deceased; Claire K. Hall, an individual; Samuel Earl Hall, a minor; Richard Lee Hall, a minor; Jerry Elmer Hall, a minor; and Durward Hall, Appellants,**

v.

**M. E. ISAACSON, sole surviving Trustee of the Mary Phyllis Neal Trust; and Howard C. Johnson, Appellees.**

**Nos. 5742–5744.**

United States Court of Appeals
Tenth Circuit.

May 7, 1958.

Paul Dudley, Oklahoma City, Okl. (Jeff A. Robertson, Topeka, Kan., C. R. Kirkbride, Kansas City, Mo., J. B. Dudley and John B. Dudley, Jr., Oklahoma City, Okl., were on the brief), for appellant Panhandle Eastern Pipe Line Co.

Elmer W. Adams, Tulsa, Okl. (Y. A. Land, Tulsa, Okl., was with him on the brief), for appellants Texas Co., Claire K. Hall and others.

W. R. Wallace, Jr., Oklahoma City, Okl., for appellees M. E. Isaacson and Howard C. Johnson.

Before PICKETT, LEWIS and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

The trial court quieted the title of appellees Isaacson and Johnson, as the owner and oil and gas lessee respectively, to an undivided one-fourth interest in the minerals underlying certain land in Beaver County, Oklahoma. The unsuccessful defendants in that action have perfected separate appeals which present identical issues.

The land involved is the East Half of Section 21 and the West Half of the Southwest Quarter of Section 22, Township 6 North, Range 22 ECM. On August 13, 1941, O. F. Neal conveyed the land to Elmer Hall by deed which contained the following provision:

"Grantors hereby except for themselves, their heirs and assigns, an undivided one-fourth interest in and to all of the oil, gas and other minerals and mineral rights in, upon and under and that may be produced from said land, for a period of fifteen years from the date hereof and as long thereafter as oil, gas and/or other minerals are produced from said land or the premises are being developed or operated, provided such production is first had within the fifteen year period, together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring and operating said land for oil, gas and other minerals and removing the same therefrom, with the right at any time to remove any and all equipment in connection therewith.

"Title to the oil, gas and other minerals and mineral rights hereby excepted is to remain vested in the said grantors, their heirs and assigns, for and during the period aforesaid."

Neal and Hall are both dead. Whatever rights Neal had under the quoted provision have passed to Isaacson, trustee, who, on April 11, 1946, made an oil and gas lease on the reserved one-fourth interest to Johnson.

The executrix of the Hall estate and the Hall heirs, appellants in No. 5744, on August 11, 1954, entered into two oil and gas leases with Panhandle Eastern Pipe Line Company,[1] the appellant in No. 5742. One lease covered the Northeast Quarter of Section 21 and the other lease covered the West Half of the Southwest Quarter of Section 22. Each lease contained appropriate provisions whereby upon the expiration of the term mineral interest the entire interest would be covered.

On September 28, 1955, The Texas Company, appellant in No. 5743, took an oil and gas lease from the Hall heirs on an undivided three-fourths interest in

1. Hereinafter referred to as Panhandle.

the Southeast Quarter of Section 21. A similar lease covering in an appropriate manner the other one-fourth interest was given by the Hall heirs to The Texas Company on February 28, 1956.

In the period December, 1953, to February, 1954, a well was drilled to the Morrow Sand on the Northeast Quarter of Section 22 by United Producing Company.[2] On a test made in March, 1954, this well, known as the Kiser well, flowed gas at the rate of 2,300,000 cubic feet per day. The well was equipped with casing, tubing, separator, well-head fittings, and measuring tanks. Since the initial test, no gas has flowed from the well except that released on a second test made in May, 1956. While the well has never been connected to any pipe line, the gas which might be produced from the well is dedicated to Colorado Interstate Pipe Line Company by a gas purchase contract. United has paid shut-in royalties to the owners of the minerals covered by the lease on the land where the Kiser well is located.

Acting under the power given to it by Title 52 O.S.1951 § 87.1, the Oklahoma Corporation Commission,[3] by appropriate order on May 25, 1956, established 640-acre drilling and spacing units for the production of natural gas from the lower Morrow Sand underlying Sections 21 and 22 and other lands. The Commission's order contained the following provision:

"That all royalty interests within any spacing unit shall be communitized and each royalty owner within any unit shall participate in the royalty from the well drilled thereon in the relation that the acreage owned by him bears to the total acreage in the unit."

No royalties for production from the Kiser well have been paid to anyone.

While the Oklahoma statute [4] permits both voluntary and compulsory pooling of working interests [5] within an established drilling and spacing unit, no such pooling has been agreed to or ordered.

The fifteen-year primary term of the one-fourth mineral interest reserved by the Neal-Hall deed expired on August 13, 1956, unless the "thereafter" clause of the reservation extended the term. The pertinent language states that the reserved one-fourth interest is for a period of fifteen years and "as long thereafter as oil, gas and/or other minerals are produced from said land or the premises are being developed or operated, provided such production is first had within the fifteen year period."

Under the Commission's drilling and spacing order, Section 21 and Section 22 each constitutes a separate unit. The Neal-Hall deed covered land in each section. The shut-in Kiser well is located in Section 22 but on land owned by strangers to this controversy.

■ Three basic questions are presented, viz.:

1. Is the reserved mineral interest extended beyond the primary term by a well located off the deeded land but within a unit which has been established by a valid drilling and spacing order?

2. If the above question is answered in the affirmative, does the shut-in Kiser well satisfy the requirements of the "thereafter" clause?

3. If both of the above questions are answered in the affirmative, is the mineral estate extended beyond the primary term so far as the land located in Section 21 is concerned?

■ In the consideration of each of these questions recognition must be given to the rule that the intent of the parties controls the interpretation of the deed.[6]

---

2. Hereinafter referred to as United.

3. Hereinafter referred to as Commission.

4. Title 52, O.S.1951 § 87.1(d).

5. In this case the holders of the working interests in the lands covered by the Neal-Hall deed are the lessees Panhandle, Texas Company, and Johnson.

6. Cridland v. Franklin, 191 Okl. 650, 132 P.2d 323, 325.

This intent is to be ascertained, if possible, from the entire instrument.[7]

■ The first question relates to the effect of the drilling and spacing order. The Oklahoma statute permitting the Commission to order the unitization of private property for the prevention of waste of underlying valuable minerals is a lawful exercise of the police power of the state.[8] The Commission found that there was a "common source of supply of natural gas" underlying the lands covered by its order and that "in the interest of securing the greatest ultimate recovery of natural gas from the pool, the prevention of waste and the protection of correlative rights," the drilling and spacing order should be entered. Each unit consisted of one governmental section. On Section 22 the permitted well was specifically designated as the then existing Kiser well.

Gas produced by the Kiser well comes from the common pool. To the extent that gas is captured from the portion of the common pool underlying the East Half of the Southwest Quarter of Section 22, that land is being developed for its mineral potential even though the gas is taken from a well located on another part of Section 22.

While this court has said in Simpson v. Stanolind Oil & Gas Co., 10 Cir., 210 F.2d 640, 642, that the purpose of the Oklahoma statute here under consideration has no relation to the termination or continuation of oil and gas leases, that decision has no application here. The spacing order did not extend the primary term. It merely set the stage for the extension of the term by an activity which met the requirements of the "thereafter" clause and which occurred somewhere within the spacing unit. To hold otherwise would be to eliminate the possibility of an extension of the primary term by a well on Section 22 to the Morrow Sand.[9]

Panhandle asserts that under the "thereafter" clause the production has to be from the deeded land to extend the term. The answer is that gas produced from the common pool is production from the entire unit, including the deeded land.

Texas Company, taking a somewhat different approach, argues that the extension of the primary term could be accomplished only by (1) actual payment of royalties pursuant to the spacing order or (2) voluntary or compulsory pooling of the seven-eighths working interest. As neither happened within the primary term, Texas Company concludes that such term was not extended. The basis for the contention is that payment of royalties could only occur after production and that, under the applicable statute, production from the land of one owner within a spacing unit is production from the land of another owner within that unit when a pooling order is entered.[10] The argument is answered by the Oklahoma decision in Wood Oil Co. v. Corporation Commission, 205 Okl. 537, 239 P.2d 1023, 1027, wherein it is held that the right to participate in production from a well completed prior to the entry of a spacing order arises as a matter of law upon the entry of such order. In the case under consideration the order was entered on May 25, 1956, within the primary term. The basic rights of the parties were fixed as of that date. The failure to obtain either a voluntary pooling agreement or compulsory pooling or-

7. Postier v. Postier, Okl., 296 P.2d 138, 139; Owens v. Day, 207 Okl. 341, 249 P.2d 710, 712; Boylan v. Lillard, 10 Cir., 174 F.2d 572, 574.

8. Patterson v. Stanolind Oil & Gas Co., 305 U.S. 376, 59 S.Ct. 259, 83 L.Ed. 231; Croxton v. State, 186 Okl. 249, 97 P.2d 11, 15.

9. Section 87.1(d), supra, prohibits the drilling of a non-permitted well into a common source of supply after the entry of a spacing order covering such common source.

10. Section 87.1(d), supra, provides in part: "The portion of the production allocated to the owner of each tract or interests included in a well spacing unit formed by a pooling order shall, when produced, be considered as if produced by such owner from the separately owned tract or interest by a well drilled thereon."

der before the expiration of the primary date does not affect those rights.

We conclude that a reasonable interpretation of the "thereafter" clause and the legal effect of the Commission order combine to result in an extension of the term if the Kiser well satisfies the requirements of that clause.

The trial court held that the Kiser well is a "commercial" well and that United had "exercised due diligence in attempting to obtain a market for gas produced" from that well. It is conceded that the well is shut-in and that no gas from it has ever been marketed.

Appellants say that the term "production" in the mineral reservation does not mean "discovery" of gas and that the oil and gas lease rule regarding reasonable time and due diligence in marketing has no application. They concede that if the instrument was an oil and gas lease rather than a deed, the primary term would have been extended.[11] Oklahoma has recognized the difference between the two types of instruments.[12]

The reservation in the Neal-Hall deed contains a "thereafter" clause which closely resembles similar clauses found in many oil and gas leases. Admitting the differences between a deed and an oil and gas lease and admitting that different rules of construction apply to the two classes of instruments, no good reason appears for not giving the same definition to the word "production" when it appears in one or the other.

Appellants rely heavily on Home Royalty Ass'n v. Stone, 10 Cir., 199 F.2d 650. That case involved a mineral reservation for a fixed term and as long thereafter as minerals are produced. Within the primary term a gas well was completed but no gas was marketed. This court, on the authority of applicable Kansas decisions,[13] held that in order to extend the term there must be actual production as distinguished from exploration and discovery during the primary term.[14] In the later case of Bristol v. Colorado Oil and Gas Corporation, supra, this court noted that the Kansas rule had been criticized and declined to follow it in a case involving a lease of Oklahoma land.

The Oklahoma Supreme Court has twice considered the effect of a production extension of the primary mineral term in a deed.[15] In each case the court held that the interruption of production for reasons beyond the control of the owner of the mineral right did not terminate the granted or reserved interest. Those cases differ from the one now under consideration in that in each case marketing occurred for a short time before the wells were shut down.

In the recent case of McVicker v. Horn, Robinson and Nathan, Okl., 322 P.2d 410, the Oklahoma Supreme Court was concerned with the definition of the term "production" as it appeared in the "thereafter" clause of an oil and gas lease. The reasoning and conclusion in that decision are applicable here. The Oklahoma court expressly rejected the Kansas rule followed in Home Royalty Ass'n v. Stone, supra, and said:[16]

"To say that *marketing* during the primary term of the lease is essential to its extension beyond said term, *unless the lease contains additional provisions indicating a contrary intent*, is not only to ignore the distinction between producing and marketing, which inheres in the nature of the oil and gas business, but

---

11. See Bristol v. Colorado Oil and Gas Corporation, 10 Cir., 225 F.2d 894.

12. In Beatty v. Baxter, 208 Okl. 686, 258 P.2d 626, 628, it was said: "An oil and gas lease is governed by different rules of construction from those applicable to other contracts, being construed most strongly against the lessee and in favor of the lessor. The reason therefor springs

from the danger of loss of oil and gas by drainage."

13. See Tate v. Stanolind Oil & Gas Co., 172 Kan. 351, 240 P.2d 465, 468, and cases there cited.

14. 199 F.2d 652.

15. See Beatty v. Baxter, supra, and Postier v. Postier, supra.

16. 322 P.2d 413.

it also ignores the difference between express and implied terms in lease contracts."

The McVicker case holds that in order for there to be production there does not have to be marketing. The only difference between a deed and a lease such as that considered in McVicker is that under the lease contract there is an implied promise to market in a reasonable time and with due diligence. This promise is implied from the other terms of the lease and the relationship of the parties. No such relationship exists between the grantor and grantee in a deed.

The Kiser well discovered gas in paying quantities. All facilities necessary to deliver the gas to a committed market have been installed except for the pipe line connection. The gas has been reduced to possession and control. Temporarily it is being stored underground. To say that marketing is required to satisfy the "thereafter" clause is to read into the mineral reservation of the deed something that is not there. Under the applicable Oklahoma law the production provision has been satisfied.

The remaining question involves the land in Section 21 which constitutes a separate unit under the drilling and spacing order. Appellants contend that the term is not extended as to land outside the unit on which the Kiser well was drilled. Reliance is placed on Louisiana cases holding that the mineral term of one portion of an estate is not extended by production in a pooling unit wherein another portion of the estate is located.[17] Oklahoma decisions involving leases are to the contrary.[18] The reasoning in the

lease cases is applicable to a deed. In Kunc v. Harper-Turner Oil Company, the Oklahoma Supreme Court said: [19]

"We think the pooling by the Corporation Commission does not have the effect of creating two separate leasehold estates and that the unitization of a portion of a lease with other lands does not affect the terms of the lease, whether production is from the portion of the unit from the lease under consideration or from another portion of the unit."

The terms of the Neal-Hall deed control. It does not divide the mineral interest into segments. If the requirements of the "thereafter" clause are met as to one part of the reserved mineral interest they are met as to the entire interest.

The mineral reservation in the Neal-Hall deed provided for an extension of the fixed term "as long thereafter as oil, gas and/or other minerals are produced from said land or the premises are being developed or operated." Commercial quantities of gas have been tapped by a well located within a validly established drilling unit which includes part of the deeded land. Development is complete except for the pipe line connection. Until that is available the gas is stored underground. There is nothing to indicate any intent of the parties to terminate the mineral reservation at the end of the fixed period under such circumstances. On the record before us it is clear that the decision of the trial court is correct.

On each appeal the judgment is affirmed.

17. Elson v. Mathewes, 224 La. 417, 69 So. 2d 734; Childs v. Washington, 229 La. 869, 87 So.2d 111; Jumonville Pipe and Machine Co. v. Federal Land Bank of New Orleans, 230 La. 41, 87 So.2d 721.

18. Kunc v. Harper-Turner Oil Company, Okl., 297 P.2d 371, 376; Trawick v. Castleberry, Okl., 275 P.2d 292, 2•3–294; Godfray v. McArthur, 186 Okl. 144, 96 P.2d 322, 324; cf. Gregg v. Harper-Turner Oil Co., 10 Cir., 199 F.2d 1.

19. 297 P.2d 376.