**TIDEWATER OIL COMPANY,**
Appellant,

v.

George E. JACKSON and Karl B. Jackson, doing business in partnership as Jackson Brothers, Appellees.

No. 6944.

United States Court of Appeals
Tenth Circuit.

June 21, 1963.

Rehearing Denied July 18, 1963.

James P. Hart, Austin, Tex., and Richard Jones, Wichita, Kan., for appellant.

Robert Martin, Wichita, Kan., for appellees.

Before MURRAH, Chief Judge, and PICKETT and LEWIS, Circuit Judges.

MURRAH, Chief Judge.

This is an appeal from a judgment for the plaintiff in a diversity suit for damages, brought by a Kansas oil and gas leaseholder against an adjoining leaseholder, for the wrongful water flooding of his lease. Water flooding is a legally and scientifically accepted method of producing oil and gas by the introduction of foreign water into an oil bearing formation, usually after primary production methods are no longer profitable. Generally, the method involves the interjection of water, under pressure, into strategically located input wells, for the purpose of generating a water drive, which pushes residual oil forward for recovery through output wells.[1]

Applicable Kansas law provides that the owner or operator of any producing oil or gas well, from any sand or producing formation, "shall be permitted, in the interest of oil and gas conservation, to introduce and inject * * * water * * * under pressure upon such sand * * * or formation, for the purpose of recovering the oil and gas contained therein," provided that such owner "shall make a written application to the state corporation commission for authority so to do, and written approval has been granted * * *." And provided further "[t]hat the operation shall be done under the rules and regulations of the commission." Kansas General Statutes, 1949, 55–133 and 55–134.

The Blankenship-Sallyard oil field in Butler and Greenwood Counties, Kansas, was discovered in 1917; was fully developed in the 1920's and early 1930's; and most, if not all, of the producing wells were fully depleted for primary recovery in 1948. The appellant, Tidewater, is the owner of a number of leases in the field, on which it drilled about 90 producing wells. Some of these leases adjoined on the south and east, the non-productive and undeveloped Barrier tract, on which appellee, Jackson Brothers, later acquired the lease in suit. Secondary recovery operations in the northeast part of the pool were first

1. See: General Counsel Report to the Interstate Oil Compact Commission, Sept. 29, 1961, and amended Oct. 13, 1961; Secondary Recovery Operations—Their Values And Their Legal Problems, by George H. Bowen, Thirteenth Annual Institute On Oil And Gas Law And Taxation, Southwestern Legal Foundation; Some Legal Aspects Of Water Flooding, by Brown and Myers, 24 Tex.Law Rev. 456; Hughes, Legal Problems Of Water Flooding, Recycling And Other Secondary Operations, Southwestern Legal Foundation, Ninth Annual Institute On Oil And Gas Law And Taxation 105 (1958); and Arkansas General Statutes, 1947, Title 53, Sec. 127.

started in 1946. Tidewater's water flood operations were commenced on its leases on the southwest edge of the pool (about two and one-half miles from the Barrier tract) in 1949. The "five spot pattern"[2] operation apparently contemplated a general plan of developing about 100 acres per year, as the flood front progressed, i. e., the water drive would proceed in stages of about 100 acres per year, northeasterly along the trend of the pool, and toward what is now the Jackson-Barrier lease. Tidewater apparently first made application to the Kansas Corporation Commission in 1953, for authority to repressure and water flood the producing sand formation under its leases in eleven sections (about 2,000 acres of leases) in Greenwood and Butler Counties, including leases immediately adjoining the then non-productive Jackson-Barrier lease.

The Jacksons had obtained a lease on the Barrier land about a year previously, and had commenced the drilling of a well (the Barrier No. 1), 48 feet from the east boundary and 61 feet from the south boundary of its lease, adjoining Tidewater's leases. The well was abandoned without production, and the lease was terminated. In 1954, however, the Jacksons obtained another lease on the same land and completed the first producing well on the original location during that year. During the period 1954 through 1956, the Jacksons drilled nine producing wells along the south and east boundaries of the Barrier lease. The wells were located on a three acre spacing pattern; they were heavily fractured; and, each of them produced oil in·paying quantities, by primary recovery methods. By mid-1956, the wells had produced approximately 100,000 barrels of oil. About this time, Tidewater notified Jackson Brothers of their intention to water flood their properties adjacent to the Barrier lease, and proposed a co-operative water flood project, the cost to be shared proportionately, according to acreage ownership in the project. The Jacksons declined to join the venture, for the expressed reason that their wells were then producing in paying quantities. Tidewater thereupon drilled three input wells, about 12 feet east of their western boundary, and converted three other wells for water injection, on Tidewater's northern lease boundary, off-setting and very close to six of the Jacksons' producing wells.

The water injected into the Tidewater input wells soon flooded eight of the Jacksons' wells, and they complained to the Kansas Corporation Commission, alleging that Tidewater had unlawfully flooded their wells, causing irreparable harm. The Commission was asked to enter a cease and desist order, and to permanently prevent the escape of salt water into the oil bearing formation underlying the complainant's lease. The Commission entered its cease and desist order and the water flooding was abated, pending a hearing before the Commission on the merits. After a full hearing, the Commission promulgated its memorandum opinion, in which it defined the issues within its province as being statutorily limited to (1) matters involving the prevention of waste; and (2) the protection of correlative rights of interested parties in a common source of supply. It then proceeded to consider whether the water flood project was within the permissive order of the Commission, and noting the absence of any claim that Tidewater's operations exceeded the authority granted, and the absence of any evidence of unlawful operation, the Commission concluded that no waste was being committed within the meaning of the conservation laws of the State of Kansas. In that respect, the Commission observed that, by its very nature, the water flood project contemplated the eventual flooding of every producing well in the reservoir, "but the oil is not lost; it is pushed forward by the injected water, which displaces the oil in the reservoir." And, that the placing of line injection wells along the

2. Under this plan, each producing well is surrounded· by four water injection wells. (R. 15)

lease boundary is the accepted method of preventing the movement of the oil from lease to lease. On the question of the correlative rights of the parties, as defined by its Rule 82–2–101,[3] the Commission stated that correlative rights related only to the ratable withdrawal of oil and gas from a common reservoir, and since no question of ratable taking was presented, there was nothing for the Commission to decide. See also: Correlative Rights In Oil And Gas, by Eugene Kuntz, 30 Miss.Law Journal, Dec. 1958, pp. 1–9. It thus concluded that "no waste of natural resources nor injury to correlative rights having been shown, it appears that the instant proceedings presents no justiciable matter for action by the Commission." It was furthermore careful to point out that "an action for damages for the flooding of producing wells may be available to the owners of such wells, but the forum for such a damage action is in the courts, not this Commission."

On judicial review to the appropriate state district court and the Supreme Court of Kansas, the Commission's memorandum and order was affirmed, as in accordance with applicable law and based upon substantial and competent evidence. See: Jackson v. State Corporation Commission, 183 Kan. 246, 326 P.2d 280, 186 Kan. 6, 348 P.2d 613. This suit was commenced and came to issue in the federal court, during the state court litigation and came on for trial a few days after the order of the Commission was affirmed by the Kansas Supreme Court.

In this federal court action, the Jacksons alleged the ownership and location of the leases, and the complete flooding of their producing wells, as a direct result of Tidewater's water flood project. They alleged that Tidewater's acts were deliberately done, with full knowledge of the consequences of such acts, and with wanton disregard of the plaintiffs' property rights. They alleged the permanent loss of oil and the necessity of drilling additional wells in an effort to capture and produce oil, which could have otherwise been produced through the existing wells, to their detriment in the amount of $800,000.00 and asked for exemplary damages in the sum of $250,000.00.

Tidewater affirmatively pleaded estoppel to litigate the issues raised in the complaint, on the grounds that all such issues had been previously litigated between the parties before the Kansas Corporation Commission, and finally affirmed in the Supreme Court of the State of Kansas. It moved for summary judgment, apparently on the ground that no triable issue survived the state court litigation and it was, therefore, entitled to a judgment as a matter of law. Throughout the trial and until final disposition, estoppel was one of the paramount issues in the case. The point is urged on appeal, and if valid, is dispositive of the lawsuit.

■ Kansas adheres to the salutary rule which plainly forbids a suitor to twice litigate matters against the same party, even on a different cause of action. See: Freeman On Judgments, 5th Ed., Vol. II, §§ 624, 625 and 670. An early Kansas case stated the "true" rule to be that "where a second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue upon the determination of which the finding was made or the judgment rendered * * *." Stroup v. Pepper, 69 Kan. 241, 76 P. 825; and see: Smith v. Russ, 184 Kan. 773, 339 P.2d 286; Security Insurance Co. of New Haven v. Johnson, 10 Cir., 276 F.2d 182.

---

3. The Commission, in its Rule 82–2–101, has defined correlative rights as follows: "Correlative Rights shall mean that each owner or producer in a common source of supply is privileged to produce therefrom only in such manner or amount as not to injure the reservoir to the detriment of others or to take an undue proportion of the oil or gas obtainable therefrom, or to cause undue drainage between developed leases."

The Jacksons first take the position that the doctrine is wholly inapplicable to determinations of an administrative tribunal, such as the Kansas Corporation Commission, and that judicial review, on the record made before the tribunal, adds nothing to the stature or dignity of the determinations of the tribunal. We think, however, that a suitor may have a full day in court in an administrative tribunal, on matters within its competence, quite as effectively and conclusively as any other adjudicatory tribunal. "Whenever any board, tribunal or person is by law vested with authority to judicially determine a question, such a determination, when it has become final, is as conclusive as though the adjudication had been made by a court of general jurisdiction." Freeman On Judgments, 5th Ed., Vol. II, § 633, p. 1335. "It is a universal principle, that, where power or jurisdiction is delegated to any public officer or tribunal over a subject-matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject-matter; and individual rights will not be disturbed collaterally, for anything done in the exercise of that discretion, within the authority and power conferred." United States v. Arredondo, 6 Pet. 691, 729, 31 U.S. 691, 729, 8 L.Ed. 547; quoted in Freeman On Judgments, 5th Ed., Vol. II, § 670, p. 1413. The essential inquiry, in any case where the conclusive effect of an order or judgment is pleaded, is thus whether the critical issue was within the power and authority conferred upon the first tribunal to which the issue was tendered, and whether the matter pleaded as collateral estoppel was actually adjudicated. See: Restatement On Judgments, § 68(1) and (2). Estoppel cannot "extend beyond the point actually litigated and determined." Cromwell v. County of Sac, 94 U.S. 351, 354, 24 L.Ed. 195. And, it operates on ultimate, as distinguished from evidentiary, facts. See: Paulos v. Janetakos, 46 N.M. 390, 129 P.2d 636, 142 A.L.R. 1237, and see Annot., p. 1243.

The determinations of the Kansas Corporation Commission, of matters within its competence, is undoubtedly binding here, insofar as applicable to this asserted claim. Cf. City of Hastings, Nebraska v. Kansas-Nebraska Natural Gas Co., 8 Cir., 226 F.2d 419. Tidewater takes the firm position that the Commission's original order gave it a legal right to water flood its properties, and incidentally to inject water in line wells adjoining the Jacksons' lease; that the lawfulness of its operations in the exercise of that right have been questioned in the Kansas courts of competent jurisdiction, and determined to be lawful and free from wrong; and, that these determinations serve to exonerate it from any tort liability to the Jacksons. Specifically, Tidewater says that if the legislative policy of the State of Kansas, with respect to oil and gas conservation, is to be effective, the determinations of the Commission must be construed to mean, "that the producer can conduct the water flooding program without legal liability for the effects which the program may have upon other owners in the same reservoir." The trial court took the view, however, that the order of the Commission did not purport to determine the issues involved in this case; and did not, therefore, work an estoppel to assert this tortious claim. We agree with the trial court, and we think the reasons are plain and irrefutable.

In this suit, no one can deny the validity of the order permitting Tidewater to water flood its properties, or that the water flood operations were being conducted in accordance with a valid order. That issue has been conclusively adjudicated in the Kansas courts, and, contrary to the trial court's findings, it must be conceded that the Commission's order "contemplated the eventual flooding of every producing well in the reservoir," even to the point of destroying the productivity of the wells on an adjoining lease. But, the fact that an act is lawfully undertaken and lawfully done does not, ipso facto, relieve the actor of liability for the harmful consequences of

his act. See: Helms v. Eastern Kansas Oil Co., 102 Kan. 164, 169 P. 208, L.R.A. 1918C, 227; and Gulf Oil Corporation v. Hughes, Okl., 371 P.2d 81. And, no one claims that the Commission is empowered to determine Tidewater's tort liability for such conduct. That matter was specifically left to a court of competent jurisdiction. And, "(w)here a court incidentally determined a matter which it would have had no jurisdiction to determine in an action brought directly to determine it, the judgment is not conclusive in a subsequent action brought to determine the matter directly." Restatement of the Law of Judgments, § 71; and see: Harvard Law Rev., Vol. 56, p. 1, 18. It is wholly inadmissible and incompatible with fundamental principles of due process to hold that a tribunal, possessing no power to adjudge tort liability, may nevertheless deprive a tort claimant of his day in court on that issue, by conclusive adjudication of the operative facts upon which his claim must rest. We hold that the issue of tort liability for the acts done and performed by Tidewater, in the exercise of its right granted by the Commission to water flood its properties, survives the determinations of the Commission; and, that they are cognizable in this proceedings.

The question then is by what standards of tort liability shall Tidewater's conduct be judged, i. e., trespass, nuisance, negligence, strict liability, or unreasonable use or disregard of another's property. The question is, of course, governed by Kansas law, and the parties concede that the Kansas courts have not considered tort liability for secondary recovery by water flood operations. We must lay aside any question of liability growing out of a compulsory unitization project, where the common source of supply is subjected to a legalized regulation, and wherein the relative rights of interested parties are determined and constitutionally protected. We are concerned with a unilateral operation, under a permissive order of the Commission, which authorizes the lease-holder to conduct water flood operations on his own lease, in a common source of supply, subject to the duties, obligations and consequent liabilities imposed by law. See: Compulsory Unitization And Individual Interests: Judicial Or Administrative?, by Maurice H. Merrill, Okla.Law Rev., Vol. 8, p. 389; Implied Covenants And Secondary Recovery, by Maurice H. Merrill, Okla.Law Rev., Vol. 4, p. 177.

In the absence of a Kansas statute governing the rights of parties, arising from the underground movement of injected and pressurized fluids, the Kansas court has applied its statute, making it "unlawful" to permit salt water, oil or refuse to escape "by overflow, seepage or otherwise" without proof that the escape was beyond control, or that it could not have been reasonably anticipated and guarded against. Kansas General Statutes, 1949, 55–121. Thus, in an action for damages for the pollution of a water supply, due to the negligent operation of a salt water disposal well, into which salt water was injected under pressure, the court absolved the claimant of the burden of proving negligence, on the theory that the statute imposed liability for the underground invasion, in the absence of proof that the acts committed were beyond the control of the operators, or could not have been reasonably anticipated and guarded against. See: Polzin v. National Co-Op. Refinery Ass'n, 175 Kan. 531, 266 P.2d 293. The Oklahoma court has held a somewhat similar Oklahoma statute (Title 52 O.S. § 296) inapplicable to underground flooding, but has readily recognized common law tort liability for intentional harm or damage to an adjoining land owner, due to underground water flooding operations. Larkins-Warr Trust v. Watchorn Petroleum Co., 198 Okl. 12, 174 P.2d 589; West Edmond Salt Water Disposal Ass'n v. Rosecrans, 204 Okl. 9, 226 P.2d 965; and West Edmond Hunton Lime Unit v. Lillard, Okl., 265 P.2d 730. Cf. Ohio Oil Company v. Elliott, 10 Cir., 254 F.2d 832. The Texas court rejects the theory of absolute liability

for the conventional rule of negligence. See: Turner v. Big Lake Oil, Tex., 96 S.W.2d 221; and Gregg v. Delhi-Taylor Oil Corp., 162 Tex. 38, 344 S.W.2d 419. They hold the orthodox rules and principles applicable to surface invasions of land inapplicable to subsurface invasion arising out of secondary recovery of natural resources, and specifically say that the technical rules of trespass have no place in the consideration of the validity of the orders of a regulatory commission. See: Railroad Commission of Texas v. Manziel, Tex., 361 S.W.2d 560.

The adjudicated cases are extensively treated under assumed facts, much like ours, by Mr. Bowen in his treatise on secondary recovery operations. (See Footnote 1) He thinks it "logical to conclude that secondary recovery operations should be governed by the negligence rule and that operators should only be liable for damage resulting from negligence or from intentional or reckless trespass, unless by specific statutory provision a more stringent degree of liability is fixed." (See: Bowen, ibid, p. 359.) Keeton and Jones in their recent article, Tort Liability And The Oil And Gas Industry, 39 Tex.Law Rev. 253, also treat all of the adjudicated cases from Kansas, Oklahoma and Texas, including the instant case in the District Court. They suggest that orthodox rules and principles applicable to surface invasions should not be appropriately applied to subsurface invasions, arising out of operations affected with a public interest and involving a weighing of the individual interest of the damaged lessee against the social interest involved in the production and conservation of crude oil. And see: Restatement Of Torts, §§ 826–831 and 832.

Whatever rule Kansas may ultimately fashion, to govern the rights and liabilities of parties affected by underground water flood operations in the interest of conservation, it seems fair to assume that it will proceed upon the basic and inescapable proposition that, "[n]o man's property can be taken, directly or indirectly, without compensation * *." Helms v. Eastern Kansas Oil Company, supra, citing Hauck v. Tidewater Pipe Line Company, Ltd., 153 Pa. 366, 26 A. 644, 20 L.R.A. 642. Even the sovereign must pay for what it takes or damages for the public good, and it cannot absolve a private party from the same duty.

Proceeding on this fundamental premise and under the rule of Polzin v. National Co-Op. Refinery Ass'n, supra, it is safe to assume that, though a water flood project in Kansas be carried on under color of public law, as a legalized nuisance or trespass, the water flooder may not conduct operations in a manner to cause substantial injury to the property of a non-assenting lessee-producer in the common reservoir, without incurring the risk of liability therefor. And see also: Gulf Oil Corporation v. Hughes, supra; and Restatement of Torts, § 822.[4]

The claim here is based upon intentional and unreasonable interference with the claimants' property rights, resulting in actual and substantial damages. The trial Court found that Tidewater had injected water at unreasonable and excessive rates in the wells located along the boundaries of the Barrier lease, "and that such injections at such high rates were especially unreasonable, since the injection wells were deliberately located as close as possible to the property line and immediately opposite and within less than 100 feet of two of the plaintiffs' wells."

These findings are, to be sure, irreconcilably inconsistent with the conclusive administrative findings to the effect that the water flooding operations were carried on in a lawful manner. In the view we take of the case, however, it is

---

4. Judicial Regulation of Discordant Land Use Interest, by Edgar R. Casper, 61 Dickinson Law Rev., January, 1957, pp. 163–187; Nuisance, Ultrahazardous Activities, And The Atomic Reactor, 30 Temple Law Quarterly, Winter, 1957, pp. 77–125.

unnecessary to reconcile the findings. It is sufficient that the water flooding activities were intentional and the consequences foreseeable. They were actionable, even though lawfully carried on, if they caused substantial injury to the claimants.

■ The factum of harm, with resultant damages to the claimants' property, may be said to have been established with reasonable certainty, and having thus established the right to recover damages, we may, under well recognized rules of law, approximate the amount thereof. See: Garcia v. Mountain States Telephone and Telegraph Company, (10 C.A.) 315 F.2d 166.

■ The trial Court's judgment for compensatory damages is based upon estimated loss of profits. From competent expert testimony, the Court specifically found that when the Jacksons drilled their first well, there was approximately 677,800 barrels of gross stock tank oil in place under the lease, and recoverable through the wells ultimately drilled on the lease; that this amount of oil would have been recovered by the Jacksons, by primary and secondary recovery methods, but for the interference of the water injected by Tidewater along the boundaries of the property. The Court further found that the production of this amount of oil would have resulted in an operating profit of $1,549,400. The Court then found that, as a direct result of the injection by Tidewater, of salt water in the line wells along the boundaries of the tract, the Barrier lease will, in fact, produce only 477,000 barrels of oil, or a net loss of approximately 192,000 barrels attributable to the working interest in the lease. Relating this net loss of recoverable oil, in terms of operating profit, the Court specifically found the loss of realizable net profit to be $620,700. The Court explained that this loss was the result of increased lifting costs, due to the necessity of disposing of excessive quantities of water injected by Tidewater; the loss of fuel for the pumping wells, due to the loss of natural gas as a result of the flooding operations; the acceleration of the time when the economic limit of production from the wells on the Barrier tract would be lost; the destruction and loss of producing wells on the Barrier property; and, the loss of substantial quantities of recoverable oil under the Barrier lease, as a result of being bypassed or "watered off" by the excessive injection of salt water by Tidewater. The findings follow closely the creditable testimony of an expert witness for the Jacksons, which the trial Court credited as against the contravailing and equally competent testimony of Tidewater.

Tidewater does not directly attack the formula employed by the credited witness in estimating the amount of recoverable oil and the cost of production, before and after the flooding. It does, however, strenuously insist that the calculations and computations were necessarily based upon the assumption that the Barrier lease was a virgin, undepleted, producing formation, at the time the wells were drilled. They insist that the Barrier lease was geologically a part of the same common source of supply, which was first tapped in 1917, and which had been fully depleted for primary recovery when the Jacksons' wells were drilled; that the production from the wells was, in fact, the result of the water flooding operation, which pushed Tidewater's oil across its lease boundary, under the Barrier lease; and, this being so, the estimated recoverable reserve, based on a virgin reservoir, is wholly erroneous and a judgment thereon cannot be sustained.

It seems to be conceded that the Barrier lease and Tidewater's depleted wells are within the same common source of supply, and that there was direct subsurface communication between the old wells and the newly drilled wells on the Jacksons' lease. But, even so, there was positive testimony to the effect that the Jacksons' wells were drilled into an "essentially virgin reservoir," due to a thinning of the producing formation on the western edge of the Tidewater lease,

thereby forming a "bar" to prevent drainage from the Barrier lease toward the old wells. In any event, the virgin reservoir premise, upon which the Jacksons' engineers based their estimated recoverable reserve, is supported by geological theories, which the trial Court apparently credited, and which we certainly cannot say are without foundation. The trial Court recognized and found that the reservoir pressure under the Barrier lease may have declined, as a result of the production on the adjacent properties, but not sufficient to seriously interfere with the ability of the wells to profitably produce, by primary recovery methods. From the whole record we are convinced that the trial Court's judgment is based upon applicable rules for ascertaining compensatory damages for loss of profits, and is supported by competent proof, and it is affirmed.

The judgment in the amount of $25,000, for exemplary damages, is based upon the finding that Tidewater "acted without justifiable excuse and with a reckless and wanton disregard of the rights and property of the plaintiffs." Kansas follows the general rule, which permits an award of damages in addition to compensatory or nominal damages, by way of punishing the wrongdoer for "willful and wanton invasion of the injured party's rights," and the burden is sustained by a showing of "such gross neglect of duty as to evince a reckless indifference of the rights of others." Watkins v. Layton, 182 Kan. 702, 324 P.2d 130; and see also: Corwine v. Maracaibo Oil Exploration Corporation, 184 Kan. 151, 334 P.2d 419; and Restatement of Torts, § 908.

The judgment for punitive damages in Corwine v. Maracaibo Oil Exploration Corporation, supra, was based upon a violation of the same statute which formed the legal basis for the compensatory judgment in Polzin v. National Co-Op. Refinery Ass'n, supra, but unlike either Corwine or Polzin, the acts complained of here, and which form the basis for both compensatory and puni-

tive judgments, were committed under color, and in accordance with, Kansas law and, while they were wrongful and actionable in the common law sense, they were, as we have seen, lawfully undertaken and lawfully done, in the interest of conservation. While we cannot know the attitude of the Kansas court in circumstances like this, we venture to forecast that, when it does speak, it will not punish a common law wrongdoer for a legalized trespass or nuisance.

The judgment for punitive damages is, therefore, reversed.

LEWIS, Circuit Judge (concurring in part and dissenting in part).

I would affirm the judgment of the trial court in its entirety. While the acts of Tidewater which resulted in damage to respondents were undertaken pursuant to a valid order of the Kansas Corporation Commission and were committed in a manner not violative of a principle of conservation (and, hence, in this limited concept, "in accordance" with the order and lawfully carried out or done within the narrow authority of the Corporation Commission's jurisdiction), still I do not consider this to be dispositive of the question of punitive damage. The administrative order is not an impenetrable shield against actionable wrong in tort, much less, as here, a bar or deterrent to the application of legal principles penalizing wanton and reckless conduct. The trial court found, and I do not understand the majority to dispute the sufficiency of the evidence to support the finding, that Tidewater so located its water injection sites and needlessly and deliberately injected excessive quantities of water for the purpose of destroying the productivity of respondents' wells. This conduct upon the part of Tidewater did not adversely affect conservation (and the Corporation Commission so found) but it did evince a reckless disregard of the rights of respondents (and the trial court so found). I am of the opinion that the trial court committed no error in assessing punitive damages.