Betty N. EMBRY, Plaintiff-Appellant,

v.

The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, Defendant-Appellee.

No. 535–70.

United States Court of Appeals, Tenth Circuit.

Oct. 21, 1971.

Rehearing Denied Nov. 26, 1971.

Gerald Sawatzky, Wichita, Kan. (Robert C. Foulston, Robert N. Partridge, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., of counsel, on the brief), for plaintiff-appellant.

Ronald M. Gott, Wichita, Kan. (Wesley A. Weathers, Lilleston, Spradling, Gott, Stallwitz & Hope, Wichita, Kan., of counsel, on the brief), for defendant-appellee.

Before PHILLIPS, MURRAH and BREITENSTEIN, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

In February 1968, Betty N. Embry commenced this action in the District Court of Sedgwick County, Kansas, against The Equitable Life Assurance Society of the United States to recover accidental death benefits under four policies of insurance issued by it to her husband, E. Ned Embry. She will be referred to hereinafter as Mrs. Embry, or the beneficiary; he, either as Embry or the insured; and it, as Equitable.

The case was duly removed to the United States District Court for the District of Kansas.

From a verdict and judgment in favor of Equitable, Mrs. Embry has appealed.

Embry was the insured and Mrs. Embry the beneficiary in each of such policies. Each of such policies was in full force and effect on May 23, 1963, the date of the alleged accident, and on June 24, 1963, the date of Embry's death.

Mrs. Embry set out her claims in four separate counts. The policies upon which Counts I and II were based provided for double indemnity benefits for death from accident, and insofar as here material were identical, except that the amount of double indemnity benefits was $10,000 in the policy upon which Count I was based and $20,000 in the policy upon which Count II was based.

The double indemnity provision in each of the policies upon which Counts I and II were based, insofar as here pertinent, read:

"The Society agrees to increase the face amount payable under said policy to ___ TEN THOUSAND ___ Dollars, (TWENTY THOUSAND Dollars in the policy upon which Count II was based) upon receipt of due proof of the Insured's death from accident as defined below, * * *.

"Death from accident means death resulting solely from bodily injuries caused directly, exclusively and independently of all other causes by external, violent and purely accidental means and ensuing within 90 days of such injuries, but does not include death resulting from or caused directly or indirectly by * * * disease or illness of any kind, physical or mental infirmity, * * *."

The policy upon which Count III was based contained a provision for additional indemnity in the event of the death of the insured by accidental means. Such provision, insofar as here material, read:

"The Society agrees, subject to the provisions hereinafter stated, to increase the face amount payable under said policy

by ___ TEN THOUSAND ___ Dollars,

upon receipt of due proof as hereinafter provided that the death of the Insured resulted solely from bodily injuries caused directly, exclusively and independently of all other causes by external, violent and purely accidental means; provided such death occurred within 90 days after the date of such injuries, * * * and provided further that such death shall not be the result of or caused directly or indirectly by

* * * * * *

"(c) disease or illness of any kind, or physical or mental infirmity;

* * *

* * * "

The policy upon which Count IV was based was an accidental death policy. It provided that Equitable would pay Mrs. Embry $50,000 in the event of the accidental death of Embry, subject to the following conditions:

That accidental death benefits became payable upon receipt of due proof; that the insured "shall have sustained bodily injury caused directly and exclusively by external, violent and purely accidental means, and, within ninety days after said injuries shall have been sustained * * subject to the limitation that 'No payment shall be made for any loss resulting from or caused directly or indirectly, wholly or partly, by (1) bodily or mental infirmity, * * * or disease or illness of any kind, * * *.' "

Prior to and on May 23, 1963, up to and including June 24, 1963, Embry was employed by Equitable as its State Agency Manager for the State of Kansas. On the former date he was traveling from Wichita to Hays, Kansas, in his own automobile on business for Equitable. His automobile was forced off the road by the driver of another automobile turning it in front of Embry's on an open highway. Embry's automobile ran into a drainage ditch while traveling at a high speed. His chest went forward against the steering wheel, causing the steering wheel to bend and the steering column to break. Embry was able to obtain a ride to La Crosse, Kansas, and was transported from there to Hays by Anita Halling in her automobile.

She testified that when she first saw Embry at La Crosse, he was pale and perspiring freely and had difficulty in getting into her automobile; that on the way to Hays Embry gave her a detailed description of the accident; that when she reached Hays she asked Embry, "Shall I take you to the hospital at Hays?" and he said, "No, take me to the office."

However, at the insistence of Equitable's representative at Hays, Embry was examined by Dr. William M. Brewer of Hays. Embry gave Dr. Brewer a clear, coordinated report of the accident, which indicated he was well oriented. Embry resisted medical attention, saying it was a sheer waste of time. However, on the insistence of the local representative of Equitable, Embry consented to go to the hospital and rest for a short time in bed for a reading of his blood pressure. Embry had been cautioned against strain, mental or physical, due to the presence of elevated blood pressure. His blood pressure was 180 over 100 when he started his bed rest and the same two and one-half hours later, when he finished resting. Dr. Brewer found the color of Embry's skin to be normal, and no visible evidence of injury nor evidence of shock.

Embry returned to Wichita on the evening of May 23, 1963. On May 24, 1963, he went to Dr. Anthony F. Rossitto of Wichita and complained of lower back and shoulder pains. He returned to Dr. Rossitto on May 27 and May 28. On

each of the first and second visits, Dr. Rossitto had Embry disrobe and examined him and found no bruises and no objective signs of injury. On the last visit, Dr. Rossitto found Embry improved so far as his complaints were concerned.

On Monday, May 27, 1963, Embry returned to his office and worked until June 24, 1963, except for a two-week trip he took with Mrs. Embry. He attended a meeting of the Board of Directors of the KU Alumni, of which he was a member, and then went on to The Homestead in Virginia, where he attended an Equitable meeting. In going from Wichita to Lawrence, Kansas, on to Virginia, and back to Wichita, Embry and Mrs. Embry traveled by automobile and he drove part of the time.

On June 24, 1963, while he was standing in front of the Central Building in Wichita talking to a friend, Embry fell to the street and was dead on his arrival by ambulance at the St. Francis Hospital in Wichita.

We shall next refer to a proceeding brought by Mrs. Embry to recover compensation from Equitable under the Kansas Workmen's Compensation Act, which was commenced and completed prior to the institution of the instant action.

At the hearing on the compensation claim, both parties offered extensive evidence.

In her brief in this court, Mrs. Embry states that she sought to prove in the workmen's compensation case that Embry's "death was caused by the accident in that the accident precipitated Embry's heart attack which occurred prior to his death," and Equitable sought to prove that "the accident had nothing to do with the heart attack and did not cause Embry's death."

The Examiner found for Mrs. Embry, and on April 3, 1967, awarded her workmen's compensation benefits.

Equitable appealed from the Examiner's award to the District Court of Rush County, Kansas, under the provisions of K.S.A. 44–556, which authorizes the District Court to make findings of fact on the evidence introduced at the proceeding before the Examiner and determine questions of law.

The Judge of the District Court of Rush County filed a memorandum opinion. In it, he stated:

"This Court likes to think that the real issue in this case is whether or not there is a causal relation between the trauma Embry experienced when he had his automobile accident on May 23, 1963, and the cause of his death which took place June 24, 1963. If there was no causal connection the claimant is not entitled to recover; but if the decedent's death was hastened, or precipitated or his physical condition aggravated and worsened by reason of the injuries he sustained May 23, 1963, then the claimant should recover."

The Court made and set forth therein findings of fact, which insofar as here pertinent, read:

"2. The automobile accident in which Embry was involved on May 23, 1963, arose out of and in the course of his employment with Equitable Life Assurance Society, the Respondent.

"3. The injury Embry sustained in the automobile accident on May 23, 1963, *aggravated a prior existing physical condition, and accelerated and precipitated his death on June 24, 1963*. (Italics ours.)

"4. The death of Embry on June 24, 1963, was caused by, precipitated and accelerated by the accidental injury Embry suffered on May 23, 1963. * * * "

And he determined that Mrs. Embry was entitled to an award against Equitable of workmen's compensation therefor in the amount of $15,000, plus $600 for funeral expenses, the expenses for medical and hospital bills, and costs. An award of those amounts was made against Equitable on October 19, 1967. It was duly filed with the Clerk of the

Rush County District Court. No appeal was taken therefrom and it became final.

In the instant action, after issues were joined by the pleadings, counsel for Mrs. Embry on December 31, 1968, filed a motion for summary judgment, on the ground that Equitable was bound by the findings of fact and the decision by the Rush County District Court in the workmen's compensation proceeding under the doctrine of estoppel by judgment or collateral estoppel; that no genuine issue as to any material fact remained; and that Mrs. Embry was entitled to judgment as a matter of law.

The federal court denied the motion for summary judgment.

After such motion was denied, the instant case was tried and resulted in a verdict and judgment in favor of Equitable. Mrs. Embry, on her appeal, assigned as one of her grounds of error the denial of such motion.

We shall decide that issue at this point in our opinion, for the reason that it will immediately follow that part of our opinion where the pertinent facts with respect thereto are set out.

For the doctrine of estoppel by judgment or by adjudication to be applicable, it is essential that the issue in the workmen's compensation case of whether Embry's death was caused by accident within the meaning of the Workmen's Compensation Act, and the issue in the instant case of whether Embry's death was caused by accident within the meaning of the provisions of the policies were identical.

In Henderson v. United States Radiator Corporation, 10 Cir., 78 F.2d 674, at page 675 (decided July 3, 1935), this court said:

"The doctrine of res judicata embodies two main rules which may be stated as follows:

"(1) The final judgment or decree of a court of competent jurisdiction upon the merits concludes the parties and their privies to the litigation, and constitutes a bar to a new action or suit upon the same cause of action either before the same or any other tribunal.

"(2) Any right, fact or matter in issue and directly adjudicated, or necessarily involved in the determination of an action before a competent court in which a judgment or decree has been rendered upon the merits, is conclusively settled by the judgment therein and cannot again be litigated between the same parties and their privies, whether the claim, demand, purpose or subject-matter of the two suits is the same or not.[1]

"The principle of the first rule is referred to as 'bar by former judgment,' and the second as 'conclusiveness of judgment.' "[2]

However, the more recent tendency is to refer to the second rule as "collateral estoppel,"[3] but that is only a matter of nomenclature. The principles are not changed.

We assume, since we find no Kansas decisions to the contrary, that the final decision of the District Court of Rush County correctly decided that the facts, as found by it in the workmen's compensation proceeding, established that Embry's death was caused by accident, as that term is used in the Workmen's Compensation Act, arising out of his employment.

The test as to whether Embry's death was accidental within the meaning of

---

1. Tait v. Western Md. Ry. Co., 289 U.S. 620, 623, 624, 53 S.Ct. 706, 77 L.Ed. 1405; Cromwell v. County of Sac, 94 U.S. 351, 352, 353, 24 L.Ed. 195; 46 Am.Jur.2d, Judgments, § 396, p. 563; Viles v. Prudential Ins. Co. of America, 10 Cir., 124 F.2d 78, 81; Mid-Continent Casualty Company v. Everett, 10 Cir., 340 F.2d 65, 69; Tidewater Oil Company v. Jackson, 10 Cir., 320 F.2d 157, 160.

2. 46 Am.Jur.2d, Judgments, § 397, pp. 563–566.

3. 46 Am.Jur.2d, Judgments, § 397, p. 565, and cases cited in note 6 thereto.

the Workmen's Compensation Act was stated by the District Court of Rush County, as follows:

" * * * the real issue in this case is whether or not there is a causal relation between the trauma Embry experienced when he had his automobile accident on May 23, 1963, and the cause of his death which took place June 24, 1963. If there was no causal connection the claimant is not entitled to recover; *but if the decedent's death was hastened, or precipitated, or his physical condition aggravated and worsened by reason of the injuries he sustained May 23, 1963, then the claimant should recover.*" (Italics ours.)

But, in the compensation proceeding the District Court of Rush County decided whether Embry's death was accidental within the meaning of the provisions of the Workmen's Compensation Act. Here, the issue is whether Embry's death was accidental under the provisions of the policies, and particularly the provisions thereof excluding from the accidental coverage death caused directly or indirectly by disease or illness of any kind or by mental infirmity. It seems obvious that the issues of fact and law as to whether Embry's death was accidental under the Workmen's Compensation Act and whether it was accidental under the provisions of the policies are not identical, but are separate and distinct issues and do not come within the second rule laid down by the Henderson case, supra.

In Williams v. Benefit Trust Life Insurance Company, 200 Kan. 51, 434 P.2d 765, there was presented to the Supreme Court of Kansas the question of whether an insured's death resulted from accident or from disease. The policy there involved contained the following provisions:

" 'I. *Exceptions and Reductions*

" '(2)(a) "Such injury" [from accident], as the term is used in this policy, is defined as bodily injury brought about by an accidental cause.

and not otherwise. Bodily injury, fatal or non-fatal, not resulting from accidental cause shall be considered only under the sickness provisions of this policy. (b) Any loss fatal or non-fatal, due wholly or in part to any disease or sickness, * * * shall be classified as sickness and not otherwise.' "

In its opinion the Supreme Court of Kansas further stated, as follows:

"There appears to be a distinct conflict of opinion between the several jurisdictions of this country as to the extent of an insurer's liability under an accident insurance policy containing provisions similar to those quoted above, where the insured has an antecedent disease or sickness. This conflict of authority is set out in 45 C.J. S. Insurance § 776, p. 813, in these words:

" 'It has been held that no recovery can be had for a death or disability, on the ground that it results solely from accidental injury, where the injury aggravates the effect of a preëxisting disease or infirmity, or the disease or infirmity aggravates the effect of the injury, and both together cause the death or disability, even though it is thereby caused at a period sooner than it otherwise would have occurred. *On the other hand, it has been held that where the death or disability results from an accidental injury aggravating or rendering active a dormant disease or infirmity, it will be regarded as being caused solely by the injury, so as to render insurer liable therefor, even though the death or disability might have resulted at a later period regardless of the injury, and even though the accident would not have had such an effect on a normal person.'* "

In its opinion the court further quoted with approval from Howe v. National Life Ins. Co., 321 Mass. 283, 72 N.E.2d 425, as follows:

" * * * A death caused by bodily injuries accidentally sustained would be within the terms of the policy if

the accident, by reason of the frailty or general weakness of the insured, a predisposition to a disease, or the presence of a disease then inactive or dormant, resulted in a fatal termination, even if this result would not have followed if the injured person was in normal health. * * * ”

In its opinion in the Williams case, the court further stated:

"Synonyms for the adjective 'dormant' are 'inactive', 'resting', 'passive', 'static', 'quiescent', while its antonym, 'active', has the contrary connotation: 'lively', * * *."

▮ As we see it, the issue here is whether, at the time of the accident Embry was suffering from a passive disease or one that was inactive and static, or whether prior to and at the time of the accident he was suffering from a coronary disease at an advanced stage, which was active, energized, and progressive in character.

▮ Dr. Karl Neudorfer performed an autopsy on the body of Embry on June 25, 1963. Because it will make the remainder of the opinion more understandable, we set out the pertinent parts of the autopsy report in subjoined note 4 hereto.[4]

4.

"DEFENDANT'S EXHIBIT A

St. Francis Hospital
Department of Pathology
Wichita, Kansas
Post-Mortem Examination

Name: Embry, Mr. Ernest N.
Age: 51 yrs.
Physician: F. J. McEwen, M. D.
Hospital No.: DOA

Date of death: 6–24–63
Date of autopsy: 6–25–63
Prospector: K. M. Neudorfer, M. D.
Autopsy No.: 159–A–63

Final Anatomic Diagnosis
Primary

Advanced arteriosclerosis of the coronary arteries with complete occlusion of the right coronary artery by thromboaic material.
Recent infarct of the posterior wall of the left ventricle of the heart.
Almost complete occlusion of the first portion of the descending branch of the left coronary artery by an organized and recanalized thrombus.
Healed infarct within the anterior wall of the left ventricle of the heart.
Hypertrophy and dilatation of the heart, (550 grams).
Edema of the lungs.
Acute and chronic congestion of the lungs, liver, spleen, and kidneys.
Congestion of the mucosa of the gastro-intestinal tract.
Petechiae within the mucosa of the stomach.
Arteriosclerosis of the aorta, splenic, renal, mesenteric and iliac arteries.

Accessory

Fibrous thickening of the leaflets of the mitral valve and of the cusps of the aortic valve.
Fibrosis of the tips of the papillary muscles.
Focal fibrosis of the myocardium.
Pericardial cyst.
Fatty infiltration of the pancreas.
Nodular hyperplasia of the prostate.

/s/ (Illegible)
Pathologist

FINAL SUMMARY:
The principal finding in this case was the thrombotic occlusion of a coronary artery with recent myocardial infarction. There was advanced arteriosclerotic

heart disease with the presence of a healed infarct in the anterior wall of the left ventricle of the heart and enlargement of the heart.

The CAUSE OF DEATH was: acute coronary artery occlusion with myocardial infarction.

This death must be classified as *Sudden Natural Death* and is not related to automobile accident which was sustained by the deceased approximately 4 weeks prior to death.

K. M. Neudorfer, M.D.
Pathologist

GROSS DESCRIPTION

Embry, Ernest                                             K. M. Neudorfer, M.D.

GENERAL INSPECTION:

The body is that of a well developed, well nourished white male, measuring 6′ in length and weighing approximately 200 pounds. Arterial embalming has been performed. The external appearance is that of the stated age. The external configuration of the head is within normal limits. The hair is brown and rather short with several streaks of gray. There is marked recession of the hairline in the region of the forehead. The external configuration of the ears is within normal limits. There is a small amount of dried blood present within the left ear. The nasal septum is in the midline. There is no discharge from the external nares. The eyes are gray. The pupils are dilated, each one measuring approximately 6 mm in diameter, they are round, equal and regular. The mouth is closed. The lips are pale, dry and not cyanotic. The trachea is in the midline. The thyroid gland cannot be palpated. No lymph nodes are palpable within the cervical region. The neck is obese. There is no recession of the supraclavicular fossae and no masses are palpated in these areas. There are no palpably enlarged axillary lymph nodes. The external configuration of the chest is within normal limits. There is a small amount of brownish-gray hair covering the anterior chest and abdominal walls. The external configuration of the upper extremities is within normal limits. There are no malformations. There is no clubbing of the fingers and no cyanosis of the fingernail beds. The anterior abdominal wall is rigid. The abdomen is protruding. No scars are present on the abdominal wall. There are no palpably enlarged inguinal lymph nodes. The external genitalia are of normal appearance. The external configuration of the lower extremities, including thighs, legs and feet, is within normal limits. There are no malformations. There is no edema of the ankles or feet. There is no clubbing of the toes and no cyanosis of the toenail beds.

PRIMARY INCISION: The usual "y" shaped incision is made. The fat layer of the anterior abdominal wall measures up to 5 cm in thickness. There is no free fluid within the abdominal cavity. The stomach and small intestine and some of the large intestines are distended. There are no deposits of fibrin on the visceroparietal peritoneum which is smooth and glistening. The pleural cavities contain no free fluid. The lungs are poorly expanded and do not fill the thoracic cages. There are no fibrous adhesions and no deposits of fibrin on the visceroparietal pleura. The pericardial cavity contains a normal amount of yellowish clear fluid. The heart appears somewhat enlarged but the epicardial and pericardial surfaces are free of fibrinous deposits.

HEART: The heart weighs 550 grams. The endocardial surface of the right auricle is smooth and glistening. There are no foci of fibrosis. The foramen ovale is closed. The leaflets of the tricuspid valve show slight focal fibrous thickening. The chordae tendineae are thin. The myocardium of the right ventricle measures 5 mm in thickness. The cusps of the pulmonic valve are thin and translucent and there are no adhesions between the cusps of the commissures. The endocardial surface of the left auricle is smooth and glistening. There are no foci of fibrosis. The leaflets of the iteral valve show slight focal fibrous thickening within the closing edges and bases by deposits of fibrous connective tissue. The chordae tendineae are thin and not fused. There is fibrosis of the tips of the papillary muscles. The myocardium of the left ventricle measures 25 mm in thickness. The cusps of the aortic valve are somewhat thickened by deposits of fibrous connective tissue. There are Lambl's excrescences on the closing edges of the aortic cusps. The ostia of the coronary arteries are narrowed by deposits of calcified atheromatous plaques. There are no adhesions between the cusps at the

Dr. Neudorfer testified by deposition. At the trial, counsel for Mrs. Embry stated he desired to offer part of such deposition in support of her case. The deposition was then read to the jury, apparently in its entirety, because as set forth in the appendix it embraced direct, cross, and redirect examinations, and neither the appendix nor the record disclosed which part was introduced by Mrs. Embry and which part by Equitable.

Hence, we will next take up the testimony of Dr. Neudorfer, which was to the following purport:

Dr. Neudorfer graduated from the Medical School of the University of Munich, Germany, in 1947. He studied for

commissures. Cut sections through all branches of the coronary arteries show an almost complete occlusion of the descending branch of the left coronary artery by organized thrombus. There is a pin point lumen present within this area. The right coronary artery at almost the right edges of the right ventricle is completely occluded by a thrombus of recent origin. The remaining branch and portions of the coronary arteries show advanced arteriosclerotic changes with deposits of calcified material throughout. Cut sections through the myocardium show a healed infarct within the interior wall of the left ventricle of the heart. There is an early infarct within the posterior wall of the left ventricle of the heart, extending through approximately ⅔ of the posterior wall area. The myocardium in this region is reddish-gray, soft and there are what appear to be zones of hemorrhage. There are also scattered zones of fibrosis within other portions of the myocardium.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MICROSCOPIC DESCRIPTION

Embry, Mr. Ernest            K. M. Neudorfer, M.D.

Heart: Multiple sections taken from the myocardium show in the area of the grossly described early infarction the myocardial fibers to have undergone degeneration and partial necrosis with loss of cross striations and in most instances also loss of the nuclei. There are zones of hemorrhage present within the myocardium in the area. In adjacent regions there is beginning infiltration with polymorphonuclear leukocytes and other inflammatory cells. There are deposits of fibrous connective tissue within the myocardium. In other regions of the myocardium there are scattered infiltrations with chronic inflammatory cells and occasionally there are a few large mononuclear cells and phagocytes which contain yellow-brown granular pigment within their cytoplasm. In the area of the grossly described healed infarct there is complete replacement of the myocardial fibers by dense fibrous connective tissue and scar tissue which contains very widely scattered small elongated or spindle-shaped nuclei. There are groups of myocardial fibers incorporated into the scar tissue, these fibers have lost their cross striations and have small hyperchromatic irregular nuclei. In other regions the myocardial fibers are large. There is fragmentation of the fibers. There is partial loss of cross striations. There are focal deposits of fibrous connective tissue, especially within the interstitial regions where there are also scattered group of chronic inflammatory cells. Thre is intestitial edema and there are focal accumulations of adult fat cells within the interstitial tissue. The blood vessels show thickening of their walls with proliferation of the intimal lining and narrowing of the lumen. Sections taken from the coronary arteries show the right coronary artery to be entirely occluded by a thrombus. Sections from the coronary arteries show the right coronary artery to be completely occluded by a recent thrombus composed of the cellular elements of the blood and fibrin. The lumen is very narrow. The wall is markedly thickened. There is deposition of large amounts of eosinophilic material within the intimal and subintimal layers. There are deposits of calcified material. There are cholesterol clefts. There are infiltrations with lymphocytes and accumulations of large mononuclear cells and phagocytes. There is proliferation of the adventitia which contain numerous groups of densely arranged lymphocytes. Other branches of the coronary arteries show advanced narrowing of the lumen, proliferation of the intima, deposits of calcified material and also proliferation of the adventitia. In many areas the lumina are extremely narrow, however, patent.

\* \* \*"

one year at the Pathological College and Institute at the University of Munich. He engaged in general practice for three years in Germany, and in 1953 he served an internship for one year at Bernert Memorial Hospital in Paterson, New Jersey. In 1954, he came to Wichita, Kansas, and started a four-year residence in pathology. After completing that in 1958, he became the Assistant Pathologist at St. Francis Hospital. In 1956, he left Wichita and went to Ashland, Kentucky, to take the directorship of the laboratory at Kings Daughters Hospital, which was where he was at the time of his testimony.

On June 24, 1963, he had performed more than 2,000 autopsies.

The remainder of Dr. Neudorfer's testimony had the following purport:

When a branch of the coronary artery which carries blood to a particular portion of the heart muscle becomes occluded and the blood supply to that portion of the heart muscle ceases, the tissue of such portion of the heart muscle dies. Such dead tissue is called an infarct. If the person survives his heart attack, then eventually the dead tissue will be replaced by new tissue, grayish in color, and after it becomes grayish in color there is no change. The new tissue, to some extent, will enable the coronary artery to supply the heart with blood.

Dr. Neudorfer found two infarcts in Embry's heart, one a healed infarct in the front wall of the heart, and one fresh infarct in the back wall of the heart. In the old infarct, the dead tissue had been replaced with live tissue. He testified that in his opinion the fresh infarct and the occlusion which caused it occurred within 12 hours before Embry's death, and the healed infarct occurred at least five weeks and probably much longer before his death.

The fresh occlusion and the fresh infarct which it caused were the causes of Embry's death.

Dr. Neudorfer examined the slides he made, referred to in the autopsy report. The slides showed portions of the coronary artery, which supplied blood to the portion of the heart muscle where the fresh infarct occurred, occluded by clots of blood. Dr. Neudorfer was unable to find any evidence of contusion or of damage to the chest area or to the heart, itself, and the microscopic slides showed no indication of trauma.

It was Dr. Neudorfer's opinion that Embry's death was caused by the fresh occlusion and infarct, and that the automobile accident sustained by Embry had absolutely nothing to do with his death four weeks later.

Dr. Neudorfer testified that atherosclerosis is the progressive development of deposits in the walls of the blood vessels. These deposits consist of fatty substances that contain cholesterol. Such deposits, as they become larger, produce a thickening of the vessel walls and a narrowing of the lumen (the passageway through which the blood travels in the blood vessels). As the disease progresses, calcium salt becomes deposited in the plaques in the blood vessel walls and the condition is then spoken of as arteriosclerosis. Sometimes the plaques in the blood vessel walls become ulcerated and a clot forms.

He further testified that Embry had a very advanced arteriosclerosis and atherosclerosis in all branches of the coronary arteries. That is to say, that the disease had progressed to the state where the blood vessels and all branches of the coronary arteries ceased to function properly, because of a narrowing of the lumen and the slowing of the movement of the blood into such arteries.

Embry had an enlarged heart of long duration, caused by the progressive coronary artery disease. It weighed 550 grams.

Advanced arteriosclerosis is an irreversible disease, that is, it is a progressive disease that keeps on getting worse, and there is no such thing as dormant or static or inactive advanced arteriosclerosis.

Embry's coronary artery disease was not only far advanced, but it was active,

energized, and progressive, and was not passive or static.

Mrs. Embry testified that when Embry returned from Hays, Kansas, the evening of May 23, 1963, his hands were trembling and were clammy, ice cold, although it was not a cold evening; that Embry said he wanted to sit down; that she suggested he lie down; that he said he could not lie down, and that his back and chest hurt; that he sat up the rest of the night with pillows at his back; that he did not want to go to bed; that she brought him a plate of food for his dinner, and that he ate only a small portion of it; that he continued to have chest pains and back pains and was never comfortable after the accident until his death; that on Saturday, May 25, 1963, she noticed red spots on his chest; that later they turned purplish; that he returned to his office the Monday following the accident, but left home late and came home early, contrary to what had been his usual custom; that he suffered from indigestion; that after a trip to Lawrence, Kansas, and to The Homestead in Virginia, he continued to go to his office late and return home early; that when he returned home he would rest and fall asleep, which was not his custom before the accident.

Dr. R. M. Gouldner, called as a witness for Mrs. Embry, testified he had practiced medicine for 52 years; that he went through college and then graduated from law school; that he then decided to study medicine and graduated from medical school; that he took post graduate work as an intern, resident, and house surgeon; that he was not a cardiologist, but that his specialty was surgery; that in his practice of surgery he observed how long it took for cuts to heal; that it depended on the size and depth of the cut into the tissue; that an appendectomy scar would heal in a week; that some finger wounds would heal in five days; that wounds of the liver took longer; that a stab wound of the heart that did not perforate would heal within eight or ten days. He apparently had no experience with re-

spect to the time it would take to heal an infarct of a portion of the heart.

In answer to a hypothetical question, Dr. Gouldner said that when the accident occurred Embry was a healthy man and after the accident, "all of a sudden" he "cannot put in full hours at his work" and has pain in his chest and back, and from that he concluded that "something happened to that heart that caused his death."

Dr. Nathaniel Shafer testified by deposition, as a witness for Mrs. Embry. The deposition was read to the jury at the trial. Dr. Shafer's testimony was to the following purport:

He took a premedical course at New York University; graduated with the degree of M.D. from New York University Bellevue Medical Center; interned at the Jewish Hospital of Brooklyn; that he had three years of residency and fellowship training at Kings County Hospital, Mount Sinai Hospital, and Montefiore; that at Mt. Sinai he was a fellow in cardiology; that he was Chief of Cardiology in the United States Army from 1958 to 1960; that since then he had practiced cardiology; that he was a member of the American College of Cardiology and a fellow of the American College of Angiology, which has to do with blood vessels. He had made a study of nonpenetrating injuries to the heart and their effects.

He examined the autopsy report. It was his opinion, based on the facts given in the hypothetical question and the autopsy report, that the accident of May 23, 1963, was the cause of Embry's death on June 24, 1963. The basis for his opinion was:

"The man had an injury severe enough to break a steering wheel. He hit his chest. He had chest pains. He had an elevated pressure right afterwards. He had symptoms of pallor, clammy hands, sweating and emotional shock. Certainly chest pains, sweating, clammy hands, and pallor are symptoms of heart damage. He continued to complain of these symptoms, was tired, pains in the left arm, con-

tinuing heartburn, and as a matter of fact, at post-mortem we don't see any other cause for heartburn in this man except a heart condition, and then he died. The man was tall. He wasn't overweight. Taller people have statistically lesser chance of having natural heart attacks. He was very young, fifty-one. He seemed to have no other precipitation or no other causes or coronary thromboses or heart attacks, such as diabetes, high blood pressure, overweight, and then he was in good health until this happened. We know this may happen by several mechanisms and heart injuries.

"Q. Would you explain to us what, in your opinion, what the mechanism is that happened in this case: A. We see that there is complete occlusion of the first portion of the descending branch of the left coronary artery. Left coronary artery comes down the front of the heart, is right beneath the breast bone, and as he struck his chest against the steering wheel, this artery is very easily injured, and one of the ways that it reacts to injury is that there may be a hemorrhage into the wall and/or a thrombus in the wall of the coronary arteries and here we see a thrombus in the coronary artery with a healed infarct in the anterior wall of the left ventricle of the heart. An infarct is a healed area of dead tissue. This one is older, and just reviewing the pathological findings, it is certainly compatible with age of four weeks when he had the injury. This healed infarct may be four weeks old. Then we have a recent infarct in another coronary artery a month later. This is certainly in keeping with the latent period or the time when an injury may damage a coronary artery only partially and go on to cause a complete occlusion in the artery within that one month's time. Certainly, emotional and physical stressful factors may cause an occlusion in an artery and a heart attack, and a month's time for this to occur is a perfectly acceptable time."

On cross-examination, he admitted the healed infarct could be five weeks old, which would antedate the accident, but that it could have been four weeks old. He agreed with Dr. Neudorfer's statement that he found advanced arteriosclerosis in the coronary arteries of Embry and complete occlusion in the right coronary artery by thrombotic material; that arteriosclerosis is a progressive development of deposits in the walls of the blood vessels; that such deposits consist of fatty substances containing cholesterol; and that Embry had that progressive development of deposits in the walls of the blood vessels prior to the accident.

When asked on cross-examination if the coronary arteriosclerosis at and prior to the time of the accident was in a progressive state, Dr. Shafer refused to express an opinion and stated it may or may not have been.

And on cross-examination, Dr. Shafer stated that Embry must have had advanced coronary arteriosclerosis prior to the accident and have had it for a number of years; that the injuries which Embry suffered at the time of the accident combined with coronary arteriosclerosis and caused Embry's death.

In addition to Dr. Neudorfer, three well-qualified and experienced physicians testified at the trial as experts in behalf of Equitable. They were Dr. William L. Hayes, Dr. Richard Lawrence Sifford, and Dr. Robert H. Kelly.

Dr. Hayes specialized in cardiology. He graduated from the University of Kansas Medical Center in 1953. He was in the Air Force from 1954 to 1956. He took a residency training in internal medicine at the University of Kansas Medical Center from 1956 until 1960. He took training at that institution in a fellowship in cardiovascular disease from 1960 to 1961 and was assigned to the Kansas University Medical Center's Veterans Hospital in Kansas City, where he was assistant chief of medicine and chief of the cardiovascular section. Since 1964, he has practiced in Wichita. He is certified by the American Board

of Internal Medicine and in the subspecialty of cardiovascular disease. He is a fellow of the American College of Physicians and a fellow in the American College of Cardiology. About 90 per cent of his practice is devoted to the heart.

Dr. Sifford holds the degree of B.A. and B.S. He received the degree of M.D. from the University of Iowa in 1952. He took an internship in internal medicine at the University of Utah from 1952 to 1953. He then served as a physician in the United States Navy for two years. He then returned to the University of Utah and had a year of specialized training for a period of two years as a National Institute's of Health Cardiac Fellow, doing clinical work and research in heart disease. Since 1958 he has practiced medicine in Wichita. He is a Diplomate of the American Board of Internal Medicine and a Fellow of the American College of Chest Physicians. At the time he testified, he was the head of the heart station at St. Joseph Hospital in Wichita and the cohead of the heart station at St. Francis Hospital in Wichita.

Dr. Kelly specialized in the field of pathology. After taking his medical training at Western Reserve University, he stayed on as a resident fellow at Western Reserve University's Institute of Pathology at University Hospital in Cleveland, Ohio.

The three doctors last above mentioned each testified that Embry died as the direct and sole result of a severely advanced coronary heart disease called arteriosclerosis, and that the automobile accident was completely unrelated to and had nothing whatever to do with Embry's death.

In response to a question as to whether the underlying cause of the occlusion and infarct in Embry's heart which occurred within 12 hours before he died was arteriosclerotic heart disease, Dr. Hayes testified that it is a process of deposition of lipids, cholesterol, and other fatty materials in the walls of the arteries, and this in turn is followed by scarring and the laying down of scar tissue around these lipid deposits, and this process progresses until it finally either completely obstructs the artery, in this case the coronary artery, or so narrows it that the blood flow through the artery is so slow and sluggish that it clots and a clot or thrombus forms, which completes the occlusion of the artery, and then the heart muscle in that area, which is dependent on that artery for its blood supply, dies, and that such condition is known as an infarction.

Doctors Sifford and Kelly described the disease of Embry's heart in the same manner. All three doctors described Embry's coronary arteriosclerosis as a disease which had been in an active, energized, and progressive state long before the accident, and which was not aggravated nor activated in any way whatever by the accident.

Dr. Sifford disputed Dr. Shafer's opinion that a person does not have a disease until he has objective signs thereof, and called such an opinion "very unsound theory."

All of Equitable's doctors testified that the normal weight of a heart in a man of Embry's size would be 350 to 375 grams, and that such enlargement was of long-standing duration and was a manifestation of coronary artery disease.

Dr. Kelly microscopically examined the slides of tissue prepared by Dr. Neudorfer and particularly the scar tissue in the heart and testified that the old infarct, which Mrs. Embry's chief expert, Dr. Shafer, assumed was caused by the automobile accident, was a minimum of nine months or older at the time of the accident.

We are of the opinion that the issues presented for determination by the jury were:

Was the advanced arteriosclerosis disease of Embry's coronary arteries, which caused the infarct, dormant at the time of the accident; and did the accident aggravate or energize such dormant disease, or was such disease advanced, active, progressive, and energized prior to and at the time of the accident.

In his charge to the jury, the court followed very closely the test laid down by the Supreme Court of Kansas in Williams v. Benefit Trust Life Insurance Company, supra.

In part, he charged the jury in substance as follows: That if they found Embry had advanced arteriosclerosis disease of his coronary arteries prior to and at the time of the accident, but at the time of the accident such disease was dormant, and the accident energized and activated such disease and Embry's death resulted therefrom, then they should answer the special interrogatory in the affirmative; but if Embry had such disease at and prior to the time of the accident, and if at the time of the accident it was advanced, active, progressive, and energized and Embry's death resulted therefrom, then they should answer it in the negative.

After a full and careful examination of the entire record and the appendix, we are of the opinion that the trial proceedings were free from error and the judgment is therefore

Affirmed.